IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

Maryland Election Integrity LLC      *
116 Defense Highway,      *
Annapolis, MD 21401      *
     *
         *Plaintiff*      *
     *
United Sovereign Americans, Inc.      *
167 Lamp and Lantern Village Suite 194      *
Chesterfield, MO 63017      *
     *
         *Plaintiff*      *
     *     Case No.:
v.      *
     *
Maryland State Board of Elections      *
151 West Street #200      *
Annapolis, MD 21401      *
     *
     SERVE ON: Michael G. Summers,      *
     In his representative capacity as the Chairman      *
     of the Maryland State Board of Elections      *
     151 West Street #200      *
     Annapolis, MD 21401      *
     *
         *Defendant*      *
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Maryland Election Integrity LLC, a Maryland limited liability company, and United Sovereign Americans, Inc., a Missouri nonprofit corporation, Plaintiffs, by Hartman, Attorneys at Law, and C. Edward Hartman, III, hereby bring this Complaint for Declaratory and Injunctive Relief, and plead as follows:

## PARTIES

1. Maryland Election Integrity LLC is a Maryland limited liability company. Its principal office is located in Maryland.

2. United Sovereign Americans, Inc. is a nonprofit corporation incorporated in the state of Missouri.

3. Maryland State Board of Elections (hereinafter referred to as "MDSBE") is a government agency that administers elections in Maryland.

## JURISDICTION AND VENUE

4. This action seeks declaratory and injunctive relief from deficient voter registration rolls leading to violations of Federal and state laws, the certification of results from a provably flawed, inaccurate, and obscure process outside the view of impartial witnesses or the public, including the use of voting systems in Maryland that are believed to have void EAC certifications in violation of federal law, and the refusal of the Maryland State Board of Elections to comply with Public Information Act (PIA) requests and Federally required transparency. This Court has subject matter jurisdiction over this complaint because the case presents substantial questions of federal law, and the state claims are so related to the federal claims that they form part of the same case or controversy. 28 U.S.C. §§ 1331 and 1367.

5. This court has authority to issue a declaratory judgment and to order injunctive and other relief that is necessary and proper pursuant to 28 U.S.C. §§2201 and 2202 as there exists a case of actual controversy.

6. This court has personal jurisdiction as the Defendant is a Maryland Agency.

7. Venue is proper in this district under 28 U.S.C. § 1391(e)(1).

## STANDING

8. Maryland Election Integrity LLC is an organization comprised of members who are registered voters in the state of Maryland.

9. The members have been and are currently harmed by the MDSBE and the ES&S voting systems currently and formerly in use in Maryland elections. The violations of Maryland election laws, the US Constitution, and Federal civil rights laws pertaining to voter registration rolls, transparency, compliance, and certification of the voting systems, and the serious issues hereinafter discussed with the overall voting systems exemplify their injury. The lack of transparency by MDSBE with respect to the voting systems and the reports generated by them has resulted in Plaintiffs being denied lawful Public Information Act (PIA) requests and the Federally mandated preservation of auditable items.

10. If the Court grants Plaintiffs' requested relief, the injury to the Plaintiffs' members would cease to exist.

11. The Supreme Court has indicated that if one party to a lawsuit has standing, other entities can join as parties without having to satisfy independently the demands of Article III, provided those parties do not seek a distinct form of relief from the party with standing. E.g., Horne v. Flores, 557 U.S. 433, 446 (2009).

12. United Sovereign Americans is not seeking a distinct form of relief and, therefore, has standing.

## BACKGROUND

13. Article 1 Section 2 of the US Constitution grants the right to choose representatives to the people of the several states, according to the voting eligibility requirements of the state.

14. The Fourteenth Amendment Section 1 defines a citizen as all people born or naturalized in the United States, and subject to the jurisdiction thereof.

15. The Fourteenth Amendment Section 2 protects the eligible citizen voters of a state against both denial, or abridgment in any way, of their vote.

3

16. The National Voter Registration Act (NVRA) was passed for the purpose of ensuring accurate, current voter registration rolls. Congress' power to pass NVRA comes from Article 1, Section 8, Clause 18 of the US Constitution, the Necessary and Proper Clause, making accurate voter rolls a requirement to uphold the right of the people to choose their representatives.

17. Of the three components of an election, voters, votes, and counts, in that order, each relies on the accuracy of the preceding component(s) in order to be trustworthy. Without all being intact, the system will not meet the requirements for certifying the vote, plainly needing the ability to prove both accuracy and compliance.

18. It is a settled legal principle that dilution of a qualified voter's vote is a form of disenfranchisement, Ex parte Siebold, 100 U. S. 371 (1879), United States v. Saylor, 322 U. S. 385 (1944), Reynolds v. Sims, 377 U.S. 533 (1964).

19. The Help America Vote Act requires that voter roll databases contain only the registrations of qualified citizen voters residing in that state. *52 USC § 21083(a)*. Each qualified voter is granted a unique statewide identifier in the database, averting the risk of double-voting, or extra ballots being cast in the name of a particular voter. Further, the constitutional mandate is that the election system must only count eligible voters. Maryland cannot demonstrate that there is effective control of eligibility in Federal or State dimensions of those requirements and has implemented a system that does not guarantee accuracy or compliance with only allowing eligible voters to register and vote.

20. The Help America Vote Act requires that federal elections adhere to an accuracy standard, "...set at a sufficiently stringent level such that the likelihood of voting system errors affecting the outcome of an election is exceptionally remote even in the closest of

elections." United States. (2002) *U.S. Federal Election Commission FEC*. United States. [Web Archive] Retrieved from the Election Assistance Commission, https://www.eac.gov/sites/default/files/eac_assets/1/28/Voting_System_Standards_Volume_I.pdf.

21. For a voting system, accuracy is defined as the ability of the system to capture the intent of the voters without error. United States. (2002) *U.S. Federal Election Commission FEC*. United States. [Web Archive] Retrieved from the Election Assistance Commission, https://www.eac.gov/sites/default/files/eac_assets/1/28/Voting_System_Standards_Volume_I.pdf.

## **FACTS**

### **Voter Rolls**

22. The National Voter Registration Act of 1993 (NVRA) states that "[t]he purposes of this act are to ensure that accurate and current voter registration rolls are maintained." *52 USC § 20501(b)(4)*.

23. Meticulous analysis of the official Maryland State Voter Registration Database reveals a minimum of 79,392 current apparent registration violations (Voter Registration Database snapshots were purchased 8/2021, 12/2021, 7/2022, 8/2022, 12/2022, 1/2023, 2/2023, 3/2023, 4/2023, 5/2023, 6/2023, and 7/2023).

24. The analysis revealed 1,699 instances of duplicate registrations, 25,084 instances of registrants with questionable inactive status, 3,366 instances of active registrations without a certified US Post Office mailing address, 5,680 instances of active registrants who moved at least 4 years ago, 605 instances of registrations with no residential address, 296 instances of active registrants with a nonstandard address, 1,218 instances of active registrants who

are deceased, 883 instances of age discrepant registration (younger than 18 or older than 115), and 40,518 instances of questionable registration date. A spreadsheet with the apparent registration violations is attached as **Exhibit A.**

25. **Exhibit A** shows the registration type, the number of apparent violations, and the Maryland election law/rule in violation.

26. The apparent violations are pursuant to Md. Election Law Code Ann. §§ 3-101, 102, 502, 503 & 504.

27. These numbers clearly show the voter rolls in Maryland are not accurate and current as required by the NVRA: *52 USC § 20501(b)(4)* and violate specific Maryland laws pertaining to voter registration, i.e. §§ 3-101, 102, 502, 503 & 504.

28. Inaccurate voter rolls have significant downstream consequences in elections.

29. The purpose of a voting system is to accurately record, store, consolidate and report the specific selections, and absence of selections, made by the voter as well as to accurately measure the intent of the total body of eligible voters that voted.

30. The definition of a voting system is found in HAVA Section 301. *52 USC § 21081.*

31. Under HAVA, a voting system is defined as "the total combination of mechanical, electromechanical, or electronic equipment (including software, firmware, and documentation required to program, control, and support the equipment) that is used to define ballots; to cast and count votes; to report or display election results; and to maintain and produce any audit trail information." *52 USC § 21081(b)(1)(A)-(D).*

32. The ability to "cast and count votes" begins with establishing eligibility, including citizenship, and registering only qualified citizens into voter registration databases, thus

assuring that all ballots granted, and thereby all votes cast and counted, are lawfully cast and counted according to the US Constitution.

33. Voter registrations are used to create pollbooks, which can either be networked or non-networked. "Networked pollbooks are electronic pollbooks with a connection to an external database, and may include a direct connection to the voter registration database or a separate server." Cybersecurity and Infrastructure Security Agency, *Critical Infrastructure Security and Resilience Note*, Jul. 28, 2020, at 2-3, https://www.cisa.gov/sites/default/files/publications/cisa-election-infrastructure-cyber-risk-assessment_508.pdf.

34. Maryland is a state in which all local jurisdictions use E-Poll books, meaning the pollbooks have a direct connection to the voter registration database.

35. Following pollbook preparation is ballot preparation. Ballot preparation "generates the data necessary for tabulating votes within a voting machine, and aggregating tabulated votes within a jurisdiction or state." Cybersecurity and Infrastructure Security Agency, *Critical Infrastructure Security and Resilience Note*, Jul. 28, 2020, at 3, https://www.cisa.gov/sites/default/files/publications/cisa-election-infrastructure-cyber-risk-assessment_508.pdf.

36. Voting machines are used following ballot preparation. "Voting machines encompass both technology and processes used by election officials to prepare voting machines for ballot tabulation, and in some cases presentation. Specifically, this includes loading the ballot files created during ballot preparation onto voting machines." Cybersecurity and Infrastructure Security Agency, *Critical Infrastructure Security and Resilience Note*, Jul.

28, 2020, at 3, https://www.cisa.gov/sites/default/files/publications/cisa-election-infrastructure-cyber-risk-assessment_508.pdf.

37. The U.S. election process seen above shows the link between voter registration and the ballot files being loaded onto voting machines.

38. It also shows voter registration is encompassed in the definition of a voting system as defined in *52 USC § 21081(b)* because a voting system consists of documentation required to program the voting machines.

39. As voter registration is part of the voting system, it is subject to the allowable error rates of voting systems as set forth in *52 USC § 21081(a)(5)*.

**<u>Error Rates</u>**

40. Section 301 of HAVA regarding "Voting System Standards," states that the "error rate of [a] voting system in counting ballots…shall comply with the error rate standards established under section 3.2.1 of the voting systems standards issued by the Federal Election Commission[.]" *52 USC § 21081(a)(5)*

41. The accuracy requirements set under the Federal Election Commission (FEC) voting systems standards section 3.2.1 establish that "the system shall achieve a target error rate of no more than one in 10,000,000 ballot positions, with a maximum acceptable error rate in the test process of one in 500,000 ballot positions." United States. (2002) *U.S. Federal Election Commission FEC*. United States. [Web Archive] Retrieved from the Election Assistance Commission,

https://www.eac.gov/sites/default/files/eac_assets/1/28/Voting_System_Standards_Volume_I.pdf.

42. The Voluntary Voting System Guidelines, Version 1.1, Section **4.1.1 – Accuracy Requirements** states in part, "[a]ll systems shall achieve a report total error rate of no more than one in 125,000." United States. (2015) *U.S. Election Assistance Commission*. United States. [Web Archive] Retrieved from the Election Assistance Commission, https://www.eac.gov/sites/default/files/eac_assets/1/28/VVSG.1.1.VOL.1.FINAL1.pdf.

43. The Voluntary Voting System Guidelines, Version 1.1, Section **4.1.1 – Accuracy Requirements** then states, "[t]he benchmark of one in 125,000 is derived from the "maximum acceptable error rate" used as the lower test benchmark in the 2005 Voluntary Voting System Guidelines Version 1.0. That benchmark was defined as a ballot position error rate of one in 500,000. The benchmark of one in 125,000 is expressed in terms of votes, however, it is consistent with the previous benchmark that the estimated ratio of votes to ballot positions is ¼." United States. (2015) *U.S. Election Assistance Commission*. United States. [Web Archive] Retrieved from the Election Assistance Commission, https://www.eac.gov/sites/default/files/eac_assets/1/28/VVSG.1.1.VOL.1.FINAL1.pdf.

44. Maryland voting systems are subject to the error rates defined in the FEC Voting System Standards 3.2.1 and explained in the Voluntary Voting System Guidelines (VVSG).

45. The number of apparent voting system errors in counting votes in the 2020 General Election, according to MDSBE raw data, was 62,075. A spreadsheet is attached showing the apparent voting violations in the 2020 and 2022 General Election as **Exhibit B.**

46. The number of apparent voting system errors in counting votes in the 2022 General Election, according to MDSBE raw data, was 27,623. This can also be seen in **Exhibit B.**

47. The allowable number of voting system errors in counting votes to comply with HAVA is calculated by dividing the total number of Maryland voters who voted in a given election by 125,000.

48. For the 2020 General Election this is ~3,000,000 votes/125,000 = 24. For the 2022 General election this is ~2,000,000 votes/125,000 = 16.

49. The number of voting system errors in counting votes for the 2020 General election (62,075) greatly exceeded the maximum allowable error rate (24).

50. The number of voting system errors in counting votes for the 2022 General election (27,623) greatly exceeded the maximum allowable error rate (16).

51. In sum, the voting system error rates are exponentially above the maximum allowable error rates. Inaccuracy and the specter of fraud have irretrievably damaged the reliability and credibility of results.

52. The Members of Plaintiff exhausted every administrative remedy known to them in advance of the 2022 general election, to have these issues repaired. Plaintiffs continued in 2023 to seek redress and repair for these egregious violations through democratic means.

53. The Maryland State Board of Elections dismissed these concerns without any meaningful review or response and intends to administer and certify Maryland's 2024 general election under the same inaccurate conditions.

**<u>Requirements for Certifying Voting Systems</u>**

54. The requirement for certifying voting systems is set forth in Section 231 of the Help America Vote Act ("HAVA"). *52 USC § 20971.*

55. Under HAVA there is a requirement for providing "for the testing, certification, decertification, and recertification of voting systems hardware and software by accredited laboratories." *52 USC § 20971(a)(1)*

56. While HAVA does allow for the "optional use by states," Maryland has adopted the certification requirements: "The State Board may not certify a voting system unless the State Board determines that…the voting system is (i) examined by an independent testing laboratory that is approved by the U.S. Election Assistance Commission; and (ii) shown by the testing laboratory to meet the performance and test standards for electronic voting systems established by the Federal Election Commission or the U.S. Election Assistance Commission[.]" *Md. Code Ann., Elec. Law § 9-102*

57. *Md. Code Ann., Elec. Law § 9-102* requires voting systems to conform with standards set by the Federal Election Commission and the U.S. Election Assistance Commission. Maryland also has received HAVA grants; therefore, the State is subject to the requirements set forth by HAVA.

58. Under HAVA, states that receive payments for improving the administration of elections must use the funds "in a manner consistent with each of the laws described in section 21145…and the proposed uses are not inconsistent with the requirements of title III." *52 USC § 20901(c)*.

59. HAVA also sets forth the requirements for accrediting testing labs that perform certification tests on voting systems.

60. HAVA states that the requirements to be met by testing labs to become accredited are found in the Voluntary Voting Systems Guidelines ("VVSG").

61. Maryland has also adopted guidelines for certification, which are governed by the Code of Maryland Regulations (COMAR), Title 33, and the Election Law of the Annotated Code of Maryland.

62. COMAR 33.09.03.04 requires that applicants submit a Technical Data Package, a Business Information Package, anti-bribery and anti-debarment affidavits, as well as voting equipment.

63. COMAR 33.09.03.05 details the requirements for the Technical Data Package.

64. Under COMAR 33.09.03.05(A) Required Information "[t]he technical data package shall contain all documentation previously submitted for the qualification testing of the system, including each of the following…(5) Software Source Code (both in the form of a listing and in a machine-readable form on media acceptable to the evaluation agent)[.]"

65. Election Systems & Software (ES&S) is the manufacturer of the voting systems currently in use in Maryland.

66. Page 4 of the ES&S EVS 5.2.0.0 Maryland State Board of Elections (MDSBE) certification report (the "Report"), dated December 4, 2014, states that the Technical Data Package was submitted.

67. Page 20 of the Report says that all listed requirements were provided **except** the Software Source Code. An excerpt of this report is attached as **Exhibit C.**

68. Under COMAR 33.09.03.05 requirements, Maryland was required to review the source code of the voting systems.

69. Maryland did not review the source code for ES&S EVS 5.2.0.0 as they were required to under Maryland Law and evidenced by the Report.

**Modem Use**

70. In January 2020, the EAC received complaints about ES&S marketing to their customers that the use of a modem on the voting system is optional. The correspondence between the EAC and ES&S is attached as **Exhibit D.**

71. The EAC determined that ES&S violated Sections 5.14 and 5.15.1 of the EAC Testing and Certification Program Manual Version 2.0 by representing or implying that the DS200 with modem configuration is EAC certified when in fact attachment of a modem is disqualifying.

72. The EAC also determined that ES&S violated Section 5.16 by failing to warn purchasers that adding a modem to the DS200 would void the EAC certification of the voting system in its entirety.

73. This violation led to a number of states using modems on the ES&S voting systems.

74. Eleven of these states acknowledged using ES&S voting systems with attached modems while others have not admitted to using modems.

75. The voting systems with modems attached were likely used for years with void EAC certification.

76. ES&S created a proposal that was used for the purpose of persuading Colorado to use its voting system on December 4, 2013 (the "Colorado Proposal") the relevant portions of which are attached as **Exhibit E.**

77. In the Colorado Proposal, ES&S sets forth questions and answers.

78. One such question, on page 13 of Section 9.0 - General Questions, asks "[i]s there any remote communication technology associated with your proposed solution?"

79. In response to the question, they state in part "[t]he DS200 Tabulators use wireless modems to connect to the SFTP Server via the Internet."

13

80. ES&S unequivocally admits that the voting systems use modems.

81. Contained in the ES&S EVS 5.2.0.0 certification report issued by the EAC, dated July 2, 2014, is a table titled "2005 VVSG Supported Functionality Declaration." The table states that modems are not a supported functionality of the voting machine. The relevant table from the certification report is attached as **Exhibit F.**

82. Page 10 of the Report for Maryland certification (December 2014) states that "[r]esults can be transferred by **modem** to the EMS server." The relevant portions of which are attached as **Exhibit G.**

83. Results in fact are not permitted to be transferred by modem as the EAC has never certified a voting system with a modem; further, simply attaching a modem will void the EAC certification.

84. Any voting system with an attached modem has a void EAC certification and is not allowed to be used according to the EAC.

85. The meeting minutes of the MDSBE meeting on July 16, 2015 show that in prior elections, three local boards – Baltimore, Montgomery, and Prince George's Counties – transmitted unofficial election results from either a polling place or a regional transmission center. The relevant portion of the meeting minutes is attached as **Exhibit H**.

86. Transmitting unofficial election results is typically accomplished by the use of a modem or email.

87. The only way to determine whether Maryland used modems to accomplish the transmission of the unofficial election results in this situation is to examine the various DS200 audit logs and configuration reports the machines generate. The logs and reports were requested from MDSBE and the Local Boards of Election, in at least 22 out of the 23 counties in Maryland,

through PIA requests but not produced. The PIA requests and/or responses are attached as **Exhibit I**.

88. Transmitting unofficial election results from a polling place leaves the system vulnerable to cyber-attacks.

89. In an MDSBE meeting dated July 27, 2017, they stated "approximately 1,400 of the DS200 scanners have non-functioning modems installed that have not been used since delivery. ES&S has started removing these modems, which they wish to put back into their own inventory. Once each modem is removed, acceptance testing will be performed on the unit under SBE and local board supervision prior to returning to service." The relevant portion of the meeting minutes is attached as **Exhibit J**.

90. A voting system with a modem installed on it has a void EAC certification.

91. Approximately 1,400 voting systems being used in Maryland prior to 2017 had void EAC certifications.

92. Maryland. Code, Elec. Law § 9-103 states MDSBE ("(2) **shall** decertify a previously certified voting system if the voting system no longer meets one or more of the standards in § 9 102(d)(1)(i) through (iii) of this subtitle.") (emphasis added)

93. Md. Code, Elec. Law § 9-102 says ("(d) The State Board may not certify a voting system unless the State Board determines that: (1) the voting system will: (i) protect the secrecy of the ballot; (ii) protect the security of the voting process; (iii) count and record all votes accurately;")

94. The voting machines did not comply with Md. Code, Elec. Law § 9-102(d)(1)(i) and (ii) considering the transmission of the unofficial results is susceptible to cyber risks.

95. In 2017 machines in Maryland had modems attached which were to be removed prior to "returning to service." This creates the presumption that the modems on the machines were in use, despite MDSBE claiming the modems were non-functioning and had not been used since delivery. This shows the machines were used in elections with attached modems. Whether the modems were functioning is irrelevant as attachment of a modem voids the EAC certification.

96. Once again, numerous PIA requests were made for the DS200 audit logs and configuration reports which would tend to show the modems were functioning or non-functioning, but not produced.

97. According to ES&S the configuration reports are automatically printed upon login to the machines; therefore, the PIA requests for these documents should have been fulfilled with responsive documents.

98. The systems were being used in elections with void EAC certifications.

**Maryland Public Information Act**

99. Maryland's Public Information Act ("PIA") gives the public the right to access government records without unnecessary cost and delay.

100.     GP § 4-103(a) provides that "[a]ll persons are entitled to have access to information about the affairs of government and the official acts of public officials and employees."

101.     In response to numerous PIA requests in most Maryland counties, MDSBE and the local Boards of Elections stated that they do not have any responsive documents.

102.     The information being requested, audit logs, system logs, error logs, configuration reports, etc. of voting systems, is information that should be available because of the audit requirements set under HAVA and COMAR.

103.    ES&S also represents that these reports and logs are either automatically generated by the machines or easily accessed in their Colorado Proposal.

104.    In Section 12.0 – UVS System Requirement of The Colorado Proposal ES&S goes into great detail about the audit logs the machines generate. The relevant portions of the Proposal are attached as **Exhibit K**.

105.    Req. ID H-1 requires the systems to "Store sufficient data in an unalterable system audit log file to allow the auditing of all operations related to election setup, ballot creation, ballot tabulation, results consolidation and report generation."

106.    ES&S's response states "[e]ach application has its own audit log to allow the auditing of all operations relating to the election setup, ballot creation, ballot tabulation, results consolidation and report generation. The ES&S proposed voting system audit log provides sufficient information to allow the auditing of all operations related to ballot tabulation, results consolidation, and report generation."

107.    The rest of the response from ES&S goes through the system audit capabilities of all the components of the voting system.

108.    ES&S responded to an inquiry for their audit trail techniques and reports in the Colorado Proposal. "Please explain what audit trail techniques and audit reports are incorporated in your proposed system."

109.    For the DS200 Tabulator ES&S stated "[i] n addition to the audit log described previously that records all use operation and substantial application operations or errors, the DS200 has various configuration reports, ballot accounting reports, and results reports, all of which can be used forensically for auditing."

110.    These reports are created by the voting machines and were requested through PIA requests but not produced.

111.    ES&S responded to an inquiry into their audit logs files, location, and access to them. "Please provide a list of all audit log files, the file location within the voting system, and the procedures to navigate to and retrieve them from the voting system."

112.    For the DS200 Tabulator ES&S states "[t] he signed audit logs are written to the log directory on the removable media. The audit log events can be accessed on the DS200 onscreen or through a printed report. When the media is read back into the EMS the audit logs are also retrievable from the EMS through a machine audit log report or exported in a comma separated format."

113.    These audit logs are created and were requested through PIA requests but not produced.

114.    Next, ES&S addresses Req. ID H-15 in the Colorado Proposal which requires the systems to "[c]reate audit records prior to the initiation of ballot counting to verify hardware and software status. These particular audit records shall include the identification of the software release, the identification of the election to be processed and the results of hardware and software diagnostic tests."

115.    ES&S's response states in part "[o]n power up, a configuration report is automatically printed to create a hard copy record of the relevant configuration and settings of the particular DS200."

116.    The fact that the configuration reports are automatically printed is confirmed by the Dorchester County Board of Elections Chief Judges' Manual. The relevant portion of the manual is attached as **Exhibit L.**

117.    The configuration reports are **automatically printed** and were requested through PIA requests but not produced. To state there are no responsive documents to this request is clearly false as the voting machines automatically print them.

118.    The Election Law of the Annotated Code of Maryland § 9-102(d) says that the "State Board may not certify a voting system unless the State Board determines that: (1) the voting system will… (vi) be capable of creating a paper record of all votes cast in order that an audit trail is available in the event of a recount, including a manual recount[.]"

119.    Pages 15 and 16 of the Report for Maryland certification (December 2014) analyze the voting system with respect to COMAR 33.09.02.07.

120.    COMAR 33.09.02.07 explains the audit trail requirement stating that: "[t]he voting system shall be capable of providing an audit trail of all ballots cast so that, in a recount, the election can be reconstructed, starting with the individual votes of all eligible voters."

121.    The Board of Elections states in the Report that ES&S EVS 5.2.0.0 satisfied the audit requirements: "[a]ll tabulators and the EMS system maintain an audit log for each election."

122.    The information Plaintiffs requested through the PIA requests is not new information that must be created. There are responsive documents to the requests, as opposed to Defendant's contentions.

123.    The information is already available on the voting systems and ES&S details how to print the reports in Chapter 20 of their Electionware Volume V: Results User's Guide. The relevant portions of the guide are attached as **Exhibit M**.

124.    The information is stored in the course of an election on the voting systems and, if not, the systems do not conform to the representations made about their capabilities to create audit logs.

125.    The PIA requests have been denied, notwithstanding the laws that were clearly drafted to allow for public review.

**Blank Ballots, Undervotes, and Overvotes**

126.    HAVA Section 301 requires voting systems to "provide the voter with the opportunity (in a private and independent manner) to change the ballot or correct any error before the ballot is cast and counted (including the opportunity to correct the error through the issuance of a replacement ballot if the voter was otherwise unable to change the ballot or correct any error.)" *52 USC §21081(a)(1)(A)(ii).*

127.    Maryland creates a Cast Vote Records report for each county in Maryland for each election, which contains the total number of registered voters, the total number of ballots cast, and the results in that county.

128.    The Cast Vote Records EL45a report shows the total number of blank ballots cast in each county in the state of Maryland for each election.

129.    Upon calculation, the total number of blank ballots cast in the 2022 General Election in Maryland was 82,356.

130.    Some counties had much higher percentages of blank ballot than others. Possible reasons for this can be explained below.

131.    It is believed that many people did not intend to cast blank ballots in the 2022 General Election, and the settings of the machines were the reason for the ballots being cast blank.

132.     Upon further inquiry, it has been discovered that the ES&S DS200 tabulator can be configured to accept blank ballots, undervotes, and overvotes instead of rejecting them and notifying the voter to cure the mistake.

133.     According to a DS200 Operators Guide dated July 18, 2019, an admin can establish the ballot handling options. The relevant portions of the guide are attached as **Exhibit N**.

134.     Section 7.4.1 – **Establishing Ballot Handling Options** Page 108 of the DS200 Operators Guide states, "[w]hen you create your election definition, your Electionware settings determine for each ballot style how the DS200 handles specific types of ballot conditions. For each of these ballot condition, you can set the DS200 to always accept or always reject ballots with a specified conditions. For some of those conditions, you can instead have the DS200 query the voter to ascertain a voter's intent. You can set the DS200 to always accept, always reject, or query the voter for the following ballot conditions: Undervoted ballot; Blank Ballot; Overvoted Ballot; and Unreadable Marks on Ballot."

135.     The DS200 operator's guide then goes to state, "Selecting **Always Accept** for any of these conditions causes the DS200 to skip the voter query function for that condition. The DS200 will not display the query screen for those conditions."

136.     The DS200 operator's guide then goes through each of the conditions (blank ballots, overvoted ballots, undervoted ballots) to show what the query looks like on the machine if the settings allow for a query.

137.     If **Always Accept** is selected on voting machines, voters are not provided the opportunity to change the ballot or correct the error before the ballot is cast and counted. This violates *52 USC §21081(a)(1)(A)(ii)* because voters are not notified of their deficient ballot and given a chance to cure the error before the machine accepts it.

138.     Section 7.11.3 – **Report Options** Page 124 of the DS200 Operators Guide details the reports and audit logs the machine generates.

139.     It states that the Configuration Report, Event Log Report and Summary Event Log, and System Log can be generated.

140.     Section 9.1 – **Reports Overview** Page 150 of the DS200 Operators Guide states "the DS200 can automatically print the Configuration, Zero Totals, and Ballot Status Accounting reports as part of the poll opening process."

141.     At the bottom of this section Page 151 of the guide states, "[y]ou can also manually request additional copies of any reports that are generated automatically."

142.     Section 9.6 – **Configuration Report** on Pages 158-160 of the DS200 Operators Guide contains a sample Configuration Report. The sample configuration report is attached as **Exhibit O**.

143.     The configuration report shows if there is a modem attached on the DS200, whether the Event log will be printed on poll close, as well as the settings for accepting blank ballots, overvotes, and undervotes.

144.     As stated previously, and emphasized by this section's findings, the configuration reports that <u>the machines automatically print </u>will confirm whether modems were in use and if the blank ballots were the product of machine settings.

145.     COMAR 33.10.01.03(B) Auditability. "The tabulators shall provide a vote cast record of all ballots cast and audit log of alerts provided to voters and tabulator events and errors."

146.     COMAR 33.10.01.03(B) proves the machine generates audit logs that would show alerts to voters. These alerts would show up for voters if they cast a blank ballot,

undervoted, or overvoted. If there are no alerts for these conditions in the audit logs, the machines were set to automatically accept these deficient ballots.

147.     The audit logs were, again, requested through PIA requests, which were not fulfilled despite statutory language stating the machines generate them.

148.     COMAR 33.10.01.03(g) – **Actions Taken to Change Conditions** is relevant to the blank ballot and PIA issues.

149.     COMAR 33.10.01.03(g)(1)(a),(b) states, "The system shall be capable of printing from its audit trail: actions taken by operators to change conditions; and the time of the occurrence."

150.     COMAR 33.10.01.03(g)(2) then states, "System operators shall record in a logbook all actions to change conditions that cannot be printed from the audit trail. That logbook, as well as all reports produced by the printer, shall be retained by the local board."

151.     This unequivocally shows that the reports and logbook must be retained by the local board under Maryland law.

152.     These reports were requested from the Local Boards of Elections, they responded stating they had no responsive records.

153.     Stating they have no responsive records for reports they are required to retain goes to show they either violated Maryland law and Federal law by failing to retain those records, or they are unlawfully denying PIA requests for the reports.

## Count I

### Declaratory Judgment - 28 U.S.C. § 2201

154.     Plaintiffs incorporates by reference and realleges the averments of paragraphs 1 through 153.

155.     28 U.S.C. § 2201 requires a case of actual controversy.

156.     There exists an actual controversy of a justiciable issue between the Maryland State Board of Elections (MDSBE) and Maryland Election Integrity, LLC within the jurisdiction of this Court concerning the interpretation of The National Voter Registration Act of 1993: *52 USC §20501(b)(4)*, Maryland. Code, Elec. Law §§ 3-101, 102, 502, 503 & 504, HAVA: *52 USC §21081,* COMAR 33.09.03.05, Maryland. Code, Elec. Law § 9-103, Md. Code, Gen. Provisions § 4-103, The Election Law of the Annotated Code of Maryland § 9-102(d), COMAR 33.09.02.07, and COMAR 33.10.01.03.

157.     Despite mandatory statutory language requiring current and accurate voter rolls, which shall include only the names and registration information of eligible citizen voters, and Maryland law specifying processes to do so, Maryland has failed to keep voter rolls accurate.

158.     Despite mandatory statutory language stating the maximum allowable error rate of voting systems, the voting systems in Maryland are still in use in violation of the statutory scheme.

159.     Despite mandatory statutory language stating the technical data package shall/must contain all documentation previously submitted, including the software source code, the Board of Elections did not receive and analyze the source code in violation of the statutory scheme.

160.     Despite mandatory statutory language stating the MDSBE shall decertify machines that do not protect the secrecy of the ballot and protect the security of the voting process, the Board of Elections did not decertify the machines in violation of the statutory scheme.

161.     Despite mandatory statutory language stating all persons are entitled to have access to information about the affairs of government, and in particular, access to an audit trail from elections, the MDSBE is denying PIA requests for this information in violation of the statutory scheme.

162.     Despite mandatory statutory language stating voters shall have the opportunity to change their ballot or correct any error before the ballot is cast, Maryland voters have been denied this in violation of the statutory scheme.

163.     In accordance with 28 U.S.C. § 2201 claims are present between the parties involved which indicate imminent and inevitable litigation.


WHEREFORE, Plaintiffs respectfully requests that this Honorable Court:

A. Determine and adjudicate the rights and liabilities of the parties with respect to Maryland laws and Federal laws in the context of voting systems and public access to voting system logs.

B. Enter a declaratory judgment order against Defendant declaring it did not properly comply with The National Voter Registration Act of 1993: *52 USC § 20501(b)(4)* and Md. Election Law Code Ann. §§ 3-101, 102, 502, 503 and 504 in maintaining accurate voter rolls.

C. Enter a declaratory judgment order against Defendant declaring the voting machines and the voting system being used in Maryland Elections exceed the maximum allowable error rate as set forth in HAVA: *52 USC § 21081*.

D. Enter a declaratory judgment order against Defendant declaring the certification of the ES&S EVS 5.2.0.0 voting system violates COMAR 33.09.03.05.

E. Enter a declaratory judgment order against Defendant declaring they failed to decertify a voting system that did not protect the secrecy of the ballot and security of the voting process, thus violating Maryland. Code, Elec. Law § 9-103.

F. Enter a declaratory judgment order against Defendant declaring it did not properly comply with Md. Code, Gen. Provisions § 4-103, The Election Law of the Annotated Code of Maryland § 9-102(d), COMAR 33.09.02.07, and COMAR 33.10.01.03. in refusing to produce election-related documents requested through PIA requests.

G. Enter a declaratory judgment order against Defendant declaring the configuration of the voting systems did not comply with *52 USC § 21081(a)(1)(A)(ii)*.

H. Grant such other and further relief as the nature of this cause may require.

## COUNT II

### Injunction

164.    Plaintiffs incorporates by reference and realleges the averments of paragraphs 1 through 163.

165.    There is a balancing test that courts typically employ in determining whether to issue an injunction. To seek a permanent injunction, the plaintiff must pass the four-step test: (1) that the plaintiff has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for the injury; (3) that the remedy in equity is warranted upon consideration of the balance of hardships between the plaintiff and defendant; and (4) that the permanent injunction being sought would not hurt public interest. See, e.g., Weinberger v. Romero—Barcelo, 456 U.S. 305, 311–313, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982); Amoco Production Co. v. Gambell, 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987).

166.     Plaintiffs, as Maryland voters and interested citizens with standing, have been irreparably injured by the voting systems currently in use in Maryland and the MDSBE. Plaintiffs allege that voter rolls are highly inaccurate, error rates on the voting systems exceed the maximum allowable error rates, voting systems were not certified correctly, machines have been used that have VOID EAC certifications, large numbers of blank ballots were cast, and the MDSBE is unlawfully withholding evidence of such. This has caused abridgement to their right to vote "[a]nd the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise" *Reynolds v. Sims*, (377 U.S. 533). The right to vote is paramount "[e]specially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Reynolds v. Sims*, 377 U.S. 533 (1964). Inaccurate voter registration practices have led to voting system error rates well above the statutory threshold causing dilution of eligible voter's votes. Use of the ES&S Voting Systems in a noncompliant manner has resulted in dilution of Plaintiff's votes and has resulted in an impaired election process resulting in concrete harm to Plaintiff's rights to vote. Denial of Plaintiff's PIA requests resulted in Plaintiffs not being able to access information in which they are entitled.

167.     The remedies available at law are wholly inadequate to compensate Plaintiffs for the injuries to their right to vote in a free and unimpaired manner and their statutory right to access public information.

168.     Plaintiffs' harms are to basic rights and the interests are clear whereas Defendant's interest in using the ES&S voting system is simply for ease of use, despite the inaccuracies

and deficiencies. Defendants have no interest in failing to keep accurate voter rolls. Defendants' interest in not fulfilling PIA requests is unknown. Any abridgment to the right to vote needs to be meticulously scrutinized and this weighs in favor of Plaintiffs.

169.     This injunction is necessary for public interest as it would notify millions of Maryland voters their rights are being abridged, and that they will no longer be, thus restoring trust in the voting process. Also, it would definitively give Marylander's access to certain public information, rather than the illusion of having access.

170.     The Defendant failed to follow the statutory scheme requiring them to provide accurate and current voter rolls. The Defendant should be mandated to cure and address any discrepancies in the voter rolls; ensure votes counted are from qualified citizen voters; ensure the number of votes counted is equal to the number of voters who voted; adhere to the accuracy requirements for federal elections; and ensure systems, machines, security measures, procedures, infrastructure, policy, and conduct are compliant with the law regarding certification, testing, operational validation, and operational implementation.

171.     The error rates of the voting system in place in the 2020 and 2022 General Election greatly exceeded the maximum acceptable error rate. The Defendant should be mandated to decertify the machines used in the 2020 and 2022 General Election in Maryland and enjoined from using them in subsequent elections.

172.     The Defendant failed to follow the statutory scheme put in place by the state of Maryland which details the procedure to be followed in certifying voting systems. The nonadherence to the statutory scheme creates grounds for the decertification of the voting system ES&S EVS 5.2.0.0. Defendant should be mandated to decertify the voting system ES&S EVS 5.2.0.0 and enjoined from using it in subsequent elections.

173.     The Defendant failed to follow the statutory scheme requiring them to protect the secrecy and security of an election. The Defendant should be mandated to decertify the voting system ES&S EVS 5.2.0.3 and enjoined from using it in subsequent elections.

174.     The Defendant failed to produce requested documents in response to numerous PIA requests. The Defendant should be mandated to produce, including but not limited to, audit logs, system logs, error logs, configuration reports, etc. of voting systems.

175.     The Defendant failed to allow voters the opportunity to change their ballot or correct any error before the ballot is cast. The Defendant should be mandated to configure voting machines to notify voters they are casting blank ballots, overvotes, and undervotes instead of automatically accepting them.

176.     The Defendant has shown willful and gross negligence in assuring the system of processes, procedures, human conduct and machines are unable to produce reliable, accurate or compliant measurements of voter intent. The Defendant should be mandated to fix the entire voting system to ensure legal compliance and required functionality. Further, the Defendant should implement a system of comprehensive testing, monitoring and auditing by a certified and accredited independent auditor to ensure the repaired system functions as required. If the electoral process cannot be proven to be accurate and compliant, the election shall not be certified, and a special election shall be held within 30 days correcting any deficits in conduct.

177.     The Defendant has flaunted the Constitutional requirement to only allow known citizens eligible to vote, to vote. Registrations, mail-in and in person voting must be required to prove identity, eligibility, and citizenship.

178.     Since it is impossible to guarantee that ballots mailed in are not tampered with or lost in transit, the Defendant should be ordered to implement a tracking system first from the printer to the voter, and then from the voter to the tabulator, so that no ballots are lost or tampered with or destroyed. In such cases the voter must be actively notified their ballot is lost and given a chance to submit a new ballot.

179.     Since a large number of unexplained blank ballots have been registered, and a larger number of votes were counted than voters that were counted as having voted, the Defendant shall be ordered to implement control mechanisms to insure chain of custody of all ballots is maintained, and forgery protection at least equal to financial security standards with bonds and currency are maintained on ballots and with ballot handling.

180.     As demonstrated by irrefutable statistics, the Defendant has lost control of the voting system. The Defendant should be mandated to use comprehensive batch control systems, as in the financial industry with item processing.

WHEREFORE, Plaintiffs respectfully requests that this Honorable Court:

A. Issue an injunction mandating Defendant update and keep accurate the voter rolls in Maryland as well as address the discrepancies previously shown.

B. Issue an injunction enjoining Defendant from administering or certifying any election wherein the voter registration database is not certified to contain only qualified citizen voters, with compliant registration records.

C. Issue an injunction enjoining Defendant from administering or certifying any election where the entire voting system, from the qualified voters' hands to the tabulated count, is not provably secure and compliant.

D.  Issue an injunction enjoining Defendant from administering or certifying any election wherein all system steps and all components thereof are not fully auditable on a transaction/action by action basis.

E.  Issue an injunction enjoining Defendant from administering or certifying any election wherein the entire system is not monitored effectively to detect real time variances from legal conduct.

F.  Issue an injunction enjoining Defendant from administering or certifying any election wherein the entire system is not open and transparent for auditing by trusted parties outside the control of the state election boards and state executives, from qualified voters' hands to the certified count.

G.  Issue an injunction enjoining Defendant from certifying any election wherein the results do not accurately and provably reflect voter intent, individually and collectively, in compliance with the law.

H.  Issue an injunction enjoining Defendant from using the voting systems used in the 2020 and 2022 General Elections in future elections in Maryland due to the exceptionally high error rates and mandating the decertification of the system or systems.

I.  Issue an injunction enjoining Defendant from using the ES&S EVS 5.2.0.0 voting system in future elections in Maryland and mandating the decertification of the system.

J.  Issue an injunction enjoining Defendant from using the ES&S EVS 5.2.0.3 voting system in future elections in Maryland and mandating the decertification of the system.

K. Issue an injunction mandating Defendant comply with PIA requests for, including but not limited to, audit logs, system logs, error logs, configuration reports, etc. of voting systems.

L. Issue an injunction mandating Defendant to program voting machines to query voters in the case they are attempting to cast a blank ballot, undervote, or overvote instead of automatically accepting such ballots.

M. Establish a Special Master to guide the Maryland State Board of Elections to institute change prior to the November 2024 election and subject to the approval of this court to:

   i. Insure we know who is voting and that each voter is provably a U.S. citizen.

   ii. Insure that the entire system from the Voter's hands to the tabulated count is provably secure including ballots from printer to storage.

   iii. Insure that all system steps and all components thereof are fully auditable on a transaction/action by action basis.

   iv. Implement a monitoring system able to effectively detect real-time variances from legal conduct.

   v. Implement a system that allows end to end insured and certified audits by trusted parties outside the control of the State Election bureaucrats and executives, from the voters' hands to the certified count. such audits to be paid for by the State. Such audits will be done at sufficient scale to prove the intent of the voters was determined accurately and in compliance with the law.

vi. Prevent elections from being certified that are unable to prove they accurately determine voter intent; individually and collectively, in compliance with the law.

N.  Grant such other and further relief as the nature of this cause may require.

Respectfully submitted,

HARTMAN, Attorneys at Law

Date: March 6, 2024                By:   */s/ C. Edward Hartman, III*
                                         C. Edward Hartman, III, No. 07716
                                         116 Defense Highway, Suite 300
                                         Annapolis, Maryland 21401-8962
                                         Telephone:     (410) 266-3232
                                         Facsimile:     (410) 266-5561
                                         Email:         Ed@Hartman.law
                                         *Attorneys for Plaintiff*

## **AFFIDAVIT**

I have personal knowledge of the facts alleged in this Complaint. Based on my personal knowledge I verify that the matters stated in this Complaint are true.

I declare under penalties of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: _3/6/2024_

_Katherine A Sullivan_
_Class A Member of Md Election Integrity LLC_