addition, the complaint alleges that non-compactness of districts itself produces harm by making more difficult candidates' use of mass media to reach the relevant electorate, increasing the cost of campaigns, and creating voter confusion. *Id.*, ¶¶ 48-52.

This lawsuit is the fifth challenge to the State's congressional districting plan, which was previously upheld against other gerrymandering claims in *Fletcher v. Lamone*, 831 F. Supp. 2d 887 (D. Md. 2011), *aff'd*, 133 S. Ct. 29 (2012); *Gorrell v. O'Malley*, Civil No. WDQ-11-2975, 2012 WL 226919 (D. Md. Jan. 19, 2012); *Olson v. O'Malley*, Civil No. WDQ-12-0240, 2012 WL 764421 (D. Md. Mar. 6, 2012); and *Benisek v. Mack*, 11 F. Supp. 3d 516 (D. Md. 2014), *aff'd*, 584 Fed.Appx. 140 (2014).  Defendants expect to file a motion to dismiss the complaint early next week.  Mr. Darsie explained how this challenge differed from the previously filed lawsuits.

2. Mr. Darsie reported that oral arguments in the *National Federation of the Blind* case have been postponed and not yet rescheduled.  They were originally scheduled for mid-September 2015.  In response to a question, Mr. Darsie responded that the appeal would likely continue regardless of whether the State Board certified the online ballot marking tool because of the attorneys fees.

**VOTING SYSTEM SOLUTION BRIEFING**

Ms. Lamone explained that State law requires that a voting system be tested by a federally accredited laboratory and found to meet testing and performance standards of the federal Voluntary Voting System Guidelines.  SBE's RFP for the new voting system, however, included a higher standard – certification by the U.S. Election Assistance Commission (EAC).

In ES&S' initial response, the company proposed version 5.2.0.0, an EAC-certified solution.  The RFP, however, required that the proposed solution be capable of transmitting unofficial election results, and in its best and final offer, ES&S proposed modem technology and version 5.3.0.0.  Release version 5.3.0.0 is not EAC-certified but had been tested by a federally accredited lab.  The lab found that version 5.3.0.0 met all but one of the required standards; it did not meet the standard relating to transmitting election night results because of prior decisions issued by the EAC.

During testing, SBE discovered a signature issue with the ExpressVote files. These files are signed with a digital signature, but if the signature starts with a zero, the leading zero is dropped when the file is transferred from ElectionWare to the ExpressVote.  Because the signatures no longer match, it triggers an error message.  ES&S submitted for EAC certification a software fix – version 5.2.0.3, and testing is expected to be complete by July 17th.  Ms. Charlson explained that the only difference between version 5.2.0.0 and 5.3.0.0 is the ability to modem, and the only difference between 5.2.0.0 and 5.2.0.3 is the fix to the signature issue.

This software issue has delayed testing but has not impacted other aspects of the project (e.g., training, documentation, mock election in October).  Although ES&S continues to deliver equipment to SBE's central warehouse, acceptance testing of the equipment is on hold.  Delivery of the equipment, however, could not begin until the assessments of the local boards' warehouses are complete, and they are due by the end of the month.

When the EAC certifies version 5.2.0.3, staff will provide board members with a copy of the lab report and EAC certification and ask the State Board to certify by email this version.  Upon approval, ES&S will install on the equipment the new version, and SBE will fully test the equipment and software and coordinate delivery of the equipment to the local boards.

**EXHIBIT**

**H**

In prior elections, three local boards – Baltimore, Montgomery, and Prince George's Counties – transmitted unofficial election results from either a polling place or a regional transmission center.  Because version 5.2.0.3 does not support this type of transmission, SBE is working with ES&S and DoIT identify a solution for the three local boards to provide timely unofficial election night results.

Ms. Lamone stated that State Law requires a comprehensive, public information program to introduce a new voting system.  In June 2015, the Board of Public Works rejected SBE's contract for the design and implementation of a voter education campaign.  Ms. Lamone explained that the proposed campaign costs less than $0.50 per voters and provided the board members with a list of the contract tasks that cannot be performed by SBE.  Ms. Lamone noted that voter education is critically important to the success of the project and inadequate voter education will generate lines since voters will have to learn how to use the system when they appear to vote.

In response to a question about whether there could be a less expensive proposal, Ms. Lamone explained that she had asked Mr. Darsie whether procurement law would permit a reduced contract amount.  Ms. Mack noted that teaching voters how to vote when they show up will generate more lines.  Mr. Hogan stated that he did not think that the Board of Public Works understood that this is a legal requirement and that funds had been budgeted for this purpose.

Mr. McManus made a motion to send to the Board of Public Works a letter requesting that the board re-consider its denial of the SBE's proposed contract with Alex + Tom and determine whether SBE could propose a smaller contract and be consistent with procurement law, and Ms. Mack seconded the motion.   The motion passed unanimously.

### APPROVAL OF CAMPAIGN FINANCE WAIVER REQUESTS
Mr. DeMarinis explained the process for a campaign committee to request a waiver of fees that have been assessed because the committee failed to file a timely report.  As of July 1, 2015, late fees will be remitted to the Fair Campaign Financing Fund (instead of SBE), and since the last board meeting, SBE has received $16,960 in late fees.  Mr. DeMarinis presented requests from eight campaign finance committees for waivers of late fees and noted that most of the committees want to close their accounts but are unable to do so because of the late fees.  He noted that, in May, Ms. Lamone denied six requests for waivers.

1. Allen, William Committee to Elect
2. George, Ron Committee To Elect
3. Guy, James (Randy), Citizens for
4. Marchini, Laurie P. Citizens for
5. Mosby, Marilyn Friends of
6. Novinger, Frank for Judge of Orphan's Court
7. Sanchez, Carlo Friends of
8. Two Terms and No More

Mr. McManus made a motion to approve the requests for waivers of late fees, and Mr. Hogan seconded the motion.  The motion passed unanimously.

### APPROVAL OF TITLE 14 WAIVER REQUESTS
Mr. DeMarinis explained the Title 14 filing requirements for businesses and presented requests from 17 businesses doing public business to waive assessed late fees.  The businesses requesting a waiver of late fees are:

1. Old Line Holding Company, Inc
2. Sidus Group, LLC
3. Maryland Thoroughbred Horsemen's Association