IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MARYLAND ELECTION INTEGRITY, LLC, *et al.,* | * |
| | * |
| | * |
| *Plaintiffs* | * |
| | * Case No.: 1:24-cv-00672-SAG |
| v. | * |
| | * |
| MARYLAND STATE BOARD OF ELECTIONS | * |
| | * |
| | * |
| *Defendant* | * |
| | * |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## <u>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>

Maryland Election Integrity LLC, a Maryland limited liability company, and United Sovereign Americans, Inc., a Missouri nonprofit corporation, Plaintiffs, by Hartman, Attorneys at Law, and C. Edward Hartman, III, hereby file this Memorandum of Law in Support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction:

## <u>INTRODUCTION</u>

The 2024 Presidential Election is set for November 5, 2024. Maryland's Primary Election is on May 14, 2024. At this time, Maryland and the State Board of Elections is unable to legally administer these elections due to violations of Maryland and federal election laws. First, and potentially most importantly, are the grossly inaccurate voter registration records of the state in violation of the National Voter Registration Act of 1993: *52 USC § 20501(b)(4)*. This important first step in verifying eligible voters has caused, and will continue to cause, downstream consequences in Maryland elections until remedied. Specifically, the inaccurate voter registration records have led to violations of the Help America Vote Act's (HAVA) voting system error rates set forth in *52 USC § 21081(a)(5)*.

HAVA was signed into law on October 29, 2002, which established the Election Assistance Commission (EAC). The EAC's purpose is to assist election officials in enhancing the administration of elections. The EAC accomplishes this by developing guidance for states to meet HAVA requirements and adopting guidelines to enhance the accuracy and reliability of voting systems. The state of Maryland's voting system is subject to the error rates set forth in HAVA. While HAVA does allow for the "optional use by states," Maryland has adopted the certification requirements: "The State Board may not certify a voting system unless the State Board determines that…the voting system is (i) examined by an independent testing laboratory that is approved by the U.S. Election Assistance Commission; and (ii) shown by the testing laboratory to meet the performance and test standards for electronic voting systems established by the Federal Election Commission ["FEC"] or the U.S. Election Assistance Commission["EAC"][.]" Md. Code Ann., Elec. Law § 9-102.

Further, states that receive payments for improving the administration of elections must use HAVA funds "in a manner consistent with each of the laws described in section 21145…and the proposed uses are not inconsistent with the requirements of title III." *52 USC § 20901*. HAVA 301 (title III) is codified as *52 USC § 21081* and sets forth the voting system error rates. Maryland has received HAVA grants and requires compliance with FEC and EAC standards in *Md. Code Ann., Elec. Law § 9-102*, thereby subjecting the state to the requirements thereof. This is important, because HAVA requires states to abide by error rates defined by the FEC and the EAC. As Maryland must abide by HAVA title III, which requires conformance with the FEC and the EAC guidelines, the state is subject to the *Voting System Standards* promulgated by the FEC and the *Voluntary Voting System Guidelines* promulgated by the EAC.

Furthermore, significant issues have been discovered with the voting machines used in Maryland Elections. The manufacturer of the voting machines and software, Election Systems & Software (ES&S), did not submit all documentation required by COMAR 33.09.03.05(A); yet the State Board of Elections put the machines into use anyway. The machines were used with attached modems, which is a security risk that requires decertification of the machines pursuant to Md. Code, Elec. Law §§ 9-102 & 103. The machines were not decertified.

Some voting machines were configured to always accept blank ballots resulting in violations of *52 USC §21081(a)(1)(A)(ii)* and Md. Code, Elec. Law §§ 9-102 & 103. *52 USC §21081(a)(1)(A)(ii)* requires that voters have the opportunity to change a deficient ballot. Md. Code, Elec. Law §§ 9-102 & 103 require decertification of a machine that does not "count and record all votes accurately." The voting system in Maryland cannot meet either requirement.

After Plaintiffs uncovered these violations, they requested reports and other voting machine related documents from the Local Boards of Elections according to the Maryland Public Information Act (PIA). Plaintiffs did not receive the requested documents. They were denied information, despite Md. General Provisions Code Ann. § 4-103(a) stating that "[a]ll persons are entitled to have access to information about the affairs of government and the official acts of public officials and employees." Md. General Provisions Code Ann. § 4-103(a), coupled with representations from ES&S, confirm Plaintiffs have a right to the requested documents and that the documents are generated during election administration.

Article 1 Section 2 of the United States Constitution grants to the people of the several states the right to choose representatives, according to the voting eligibility requirements of the state. The Fourteenth Amendment Section 1 defines a citizen as all people born or naturalized in the United States, and subject to the jurisdiction thereof. The Fourteenth Amendment Section 2

protects the eligible citizen voters of a state against both denial, or abridgment in any way, of their vote. The National Voter Registration Act (NVRA) *52 USC § 20501* was passed to ensure accurate and current voter registration rolls.

Maryland cannot demonstrate that there is effective control of eligibility in Federal or State elections for these requirements and has implemented a system that does not guarantee accuracy or compliance with only allowing eligible voters to register and vote. Restoring trust to Maryland Elections is therefore paramount and is the Plaintiffs ultimate goal. Free and fair elections are the cornerstone of American democracy and a basic right of Marylanders.

## FACTS/ARGUMENT

### *Voter Rolls*

The National Voter Registration Act of 1993 (NVRA) states that "[t]he purposes of this act are to ensure that accurate and current voter registration rolls are maintained." 52 USC § 20501(b)(4). As reflected in **Exhibit A** to the Affidavit of Harry Haury, a meticulous analysis of the official Maryland State Voter Registration Database reveals at least 79,392 current apparent registration violations. The analysis revealed 1,699 instances of duplicate registrations, 25,084 instances of registrants with questionable inactive status, 3,366 instances of active registrations without a certified US Post Office mailing address, 5,680 instances of active registrants who moved at least 4 years ago, 605 instances of registrations with no residential address, 296 instances of active registrants with a nonstandard address, 1,218 instances of active registrants who are deceased, 883 instances of age discrepant registration (younger than 18 or older than 115), and 40,518 instances of questionable registration date. A spreadsheet evidencing these

apparent registration violations is attached to the Affidavit of Harry Haury on page 4 of **Exhibit A**.

The number of apparent registration errors clearly shows that the voter rolls in Maryland violate the purpose of *52 USC § 20501(b)(4)* by failing to ensure "that accurate and current voter registration rolls are maintained." Also, the inaccuracy in the voter rolls violates specific Maryland laws pertaining to voter registration, i.e. Md. Election Law Code Ann. §§ 3-101-102, 502-504.

Md. Election Law Code Ann. § 3-101(c) requires the State Administrator to "define, maintain, and administer the statewide voter registration list" and "ensure the currency and accuracy of each individual voter's registration record[.]" The presence of duplicate registrations confirms the State Administrator has failed to ensure the currency and accuracy of individual voter's registration records.

Furthermore, Md. Election Law Code Ann. § 3-102(a)(1) states, "an individual may become registered to vote if the individual: is a citizen of the United States; is at least 16 years old; is a resident of the State as of the day the individual seeks to register; and registers pursuant to this title." In Maryland there have been violations of Md. Election Law Code Ann. § 3-102(a)(1) because there are individuals registered younger than 16. Also, because of active registrations without a certified U.S. Post Office mailing address, active registrations with no residential address, and active registrations with a nonstandard address, which show individuals did not prove residency in Maryland when registering to vote. Finally, there were a number of voters with questionable registration dates, i.e. registered on a federal holiday, and therefore, the voter did not register pursuant to this title (Md. Election Law Code Ann. § 3).

Further, Md. Election Law Code Ann. § 3-502(c) establishes an affirmative duty for election officials to identify and update records of moved voters. There are many instances of

active registrants who moved at least four years ago, showing election officials breached their duty to identify and remove voters from the registration records that have moved. Md. Election Law Code Ann. § 3-503(c) states, "an inactive voter who fails to vote in an election in the period ending with the second general election shall be removed from the statewide voter registration list." There have been many instances where this law was violated. Specifically, there are instances of voters' status changing from inactive to active and back to inactive in a short period of time.

Md. Election Law Code Ann. § 3-504(a)(3) requires the State Administrator to make arrangements with the United States Social Security Administration or other approved entity to receive reports for Maryland residents who are deceased. There are a number of active registrants who are deceased in violation of Md. Election Law Code Ann. § 3-504(a)(3). Inaccurate voter rolls have significant downstream consequences in elections. It is imperative for voter registration records to be accurate for the voting system to be free and fair; if not, the votes of otherwise ineligible voters may be cast. Counting even one vote from an ineligible voter dilutes the vote of eligible voters. It should not and cannot happen. A temporary restraining order and preliminary injunction are appropriate remedies as the 2024 general election is fast approaching and these violations need to be addressed and remedied.

***Error Rates***

Voter registration falls under the definition of "voting system" as set forth in *52 USC § 21081(b)*, which is defined as "the total combination of mechanical, electromechanical, or electronic equipment (including the software, firmware, and documentation required to program, control, and support the equipment) that is used to define ballots; to cast and count votes; to report or display election results; and to maintain and produce any audit trail information[.]" Voter registration consists of documentation required to program, control, and support the equipment.

Section 301 of the Help America Vote Act (HAVA) regarding "Voting System Standards," states that the "error rate of [a] voting system in counting ballots…shall comply with the error rate standards established under section 3.2.1 of the voting systems standards issued by the Federal Election Commission which are in effect on the date of enactment of this Act." *52 USC § 21081(a)(5)*. The accuracy requirements set under the Federal Election Commission (FEC) *Voting Systems Standards §* 3.2.1 establish that "the system shall achieve a target error rate of no more than one in 10,000,000 ballot positions, with a maximum acceptable error rate in the test process of one in 500,000 ballot positions." *Federal Election Commission,* Voting System Standards, Volume 1: Performance Standards. April 2002.

This number has subsequently been refined by the U.S Election Assistance Commission (EAC) in the *Voluntary Voting System Guidelines* to represent votes instead of ballot positions. The maximum allowable error rate for the voting system in counting votes was defined by the EAC as 1/125,000. *Election Assistance Commission*, Voluntary Voting System Guidelines, Volume 1: Version 1.1. 2015.

The number of apparent voting system errors in counting votes in the 2020 General Election, according to MDSBE raw data, was 62,075. The number of apparent voting system errors in counting votes in the 2022 General Election, according to MDSBE raw data, was 27,623. A spreadsheet evidencing these apparent voting violations is attached to the Affidavit of Harry Haury on page 5 of **Exhibit A**. The allowable number of voting system errors in counting votes to comply with HAVA is calculated by dividing the total number of Maryland voters who voted in a given election by 125,000.

For the 2020 General Election this is ~3,000,000 votes/125,000 = 24. For the 2022 General election this is ~2,000,000 votes/125,000 = 16. The number of voting system errors in counting

votes for the 2020 General election (62,075) greatly exceeded the maximum allowable error rate (24). The number of voting system errors in counting votes for the 2022 General election (27,623) greatly exceeded the maximum allowable error rate (16). In sum, the voting system error rates are exponentially above the maximum allowable error rates. Inaccuracy and the specter of fraud have irretrievably damaged the reliability and credibility of results. A temporary restraining order and preliminary injunction are necessary to bring the Maryland voting system back into compliance with the maximum allowable error rates required by *52 USC § 21081(a)(5)*, defined by the Federal Election Commission in the *Voting System Standards*, and refined by the Election Assistance Commission in the *Voluntary Voting System Guidelines*. This must be done prior to the 2024 primary and general elections to achieve legally certifiable results.

### Requirements for Certifying Voting Systems

The requirements for certifying voting systems are set forth in Section 231 of the Help America Vote Act ("HAVA"). *52 USC § 20971*. HAVA requires "the testing, certification, decertification, and recertification of voting systems hardware and software by accredited laboratories." *52 USC § 20971(a)(1)* While HAVA does allow for the "optional use by states," Maryland has adopted the certification requirements: "The State Board may not certify a voting system unless the State Board determines that…the voting system is (i) examined by an independent testing laboratory that is approved by the U.S. Election Assistance Commission; and (ii) shown by the testing laboratory to meet the performance and test standards for electronic voting systems established by the Federal Election Commission or the U.S. Election Assistance Commission[.]" *Md. Code Ann., Elec. Law § 9-102*

*Md. Code Ann., Elec. Law § 9-102* requires voting systems to conform with standards set by the Federal Election Commission and the U.S. Election Assistance Commission. Maryland also

has received HAVA grants; therefore, the State is subject to the requirements set forth by HAVA. Under HAVA, those states that receive payments for improving the administration of elections must use the funds "in a manner consistent with each of the laws described in section 21145…and the proposed uses are not inconsistent with the requirements of title III." *52 USC § 20901(c)*. If states are subject to HAVA, they may set more stringent requirements than set forth in HAVA but not less stringent. Maryland can be seen as having set more stringent requirements, as they must abide by HAVA and COMAR.

Maryland guidelines for certification are governed by the Code of Maryland Regulations (COMAR), Title 33, and the Election Law of the Annotated Code of Maryland. COMAR 33.09.03.04 requires that applicants for state certification submit a Technical Data Package, a Business Information Package, anti-bribery and anti-debarment affidavits, as well as voting equipment. COMAR 33.09.03.05 details the requirements for the Technical Data Package, which must "contain all documentation previously submitted for the qualification testing of the system, including each of the following…(5) Software Source Code (both in the form of a listing and in a machine-readable form on media acceptable to the evaluation agent)[.]"

Election Systems & Software (ES&S) is the manufacturer of the voting systems currently in use in Maryland and was certified for use in the state on December 4, 2014. The Maryland State Board of Elections (MDSBE) issued a certification report for the ES&S EVS 5.2.0.0. This same report exemplifies the fact that the MDSBE was not given all of the documentation by ES&S that their own laws require, and yet they still certified the voting machines for use in Maryland. An excerpt of the report proving the MSBE did not review the source code is attached to the Affidavit of Chris Gleason on page 20 of **Exhibit A**. Proper certification of a voting machine is the necessary first step before a voting machine can be used in elections. Maryland did not properly certify the

ES&S EVS 5.2.0.0. A temporary restraining order and preliminary injunction are necessary to prevent the use of the ES&S EVS 5.2.0.0 voting system in subsequent Maryland Elections.

***Modem Use***

In January 2020, the EAC received complaints about ES&S marketing to their customers that the use of a modem on the voting system is optional. The correspondence between the EAC and ES&S is attached to the Affidavit of Chris Gleason as **Exhibit B.** The EAC determined that ES&S violated Sections 5.14 and 5.15.1 of the EAC Testing and Certification Program Manual Version 2.0 by representing or implying that the DS200 with modem configuration is EAC certified when in fact attachment of a modem is disqualifying. The EAC also determined that ES&S violated Section 5.16 by failing to warn purchasers that adding a modem to the DS200 would void the EAC certification of the voting system in its entirety.

Specifically, ES&S represented to the MDSBE that "results can be transferred by modem to the EMS server." This representation can be seen in the Affidavit of Chris Gleason on page 10 of **Exhibit A**. This representation was made to the MDSBE after the EAC certified the ES&S EVS 5.2.0.0. Contained in the ES&S EVS 5.2.0.0 certification report issued by the EAC, dated July 2, 2014, is a table titled "2005 *Voluntary Voting System Guidelines* (VVSG) Supported Functionality Declaration." The table states that modems are not a supported functionality of the voting machine. The relevant table from the certification report is attached as **Exhibit 1.** ES&S and the MDSBE had or should have had knowledge that modems were not a VVSG supported functionality.

Furthermore, on July 27, 2017, the MDSBE stated "approximately 1,400 of the DS200 scanners have non-functioning modems installed that have not been used since delivery. ES&S has started removing these modems, which they wish to put back into their own inventory. Once each modem is removed, acceptance testing will be performed on the unit under SBE and local

board supervision prior to <u>returning to service.</u>" The relevant portion of the meeting minutes is attached to the Affidavit of Chris Gleason as **Exhibit D**. As previously noted, a voting machine with an attached modem has a void EAC certification. The reason for this is because attachment of a modem and subsequently transmitting unofficial election results presents serious security risks to election results.

Maryland. Code, Elec. Law § 9-103 states MDSBE ("(2) **shall** decertify a previously certified voting system if the voting system no longer meets one or more of the standards in § 9 102(d)(1)(i) through (iii) of this subtitle.") (emphasis added). Md. Code, Elec. Law § 9-102 says ("(d) The State Board may not certify a voting system unless the State Board determines that: (1) the voting system will: (i) protect the secrecy of the ballot; (ii) protect the security of the voting process; (iii) count and record all votes accurately;"). The voting machines did not comply with Md. Code, Elec. Law § 9-102(d)(1)(i) and (ii) considering modems present security risks. The MDSBE apparently acknowledged the risks of attached modems yet did not subsequently follow Maryland law requiring them to decertify the voting machines. Furthermore, 1400 voting machines in Maryland were operating with void EAC certifications.

It is very simple to determine whether modems are still attached to voting machines in Maryland and thus still present significant security issues. All one needs to do is look at the configuration report the machines automatically generate. Plaintiffs requested these configuration reports from the MDSBE and the Local Boards of Elections through PIA requests to which most Local Boards responded stating they had "no responsive documents" or a similar denial. A temporary restraining order and preliminary injunction decertifying and preventing Maryland from using the ES&S EVS 5.2.0.3 voting machines is necessary because the security of the voting process has been compromised.

*Maryland Public Information Act*

Maryland's Public Information Act ("PIA") gives the public the right to access government records without unnecessary cost and delay. GP § 4-103(a) provides that "[a]ll persons are entitled to have access to information about the affairs of government and the official acts of public officials and employees." In response to PIA requests that Plaintiffs sent to at least 22 out of 23 Maryland counties and Baltimore City, MDSBE and the local Boards of Elections stated that they do not have any responsive documents. A sample PIA request and response from Howard County is attached to the Affidavit of Chris Gleason as **Exhibit H.**

The information being requested, audit logs, system logs, error logs, configuration reports, etc. of voting systems, is information that should be available because HAVA and COMAR require it. ES&S also represents that these reports and logs are either automatically generated by the machines or easily accessed based on a proposal they sent to the state of Colorado (the "Colorado Proposal"). The relevant portions of the Colorado Proposal are attached as **Exhibit 2**.

In the Colorado Proposal, ES&S makes a list of representations. They state "each application has its own audit log to allow the auditing of all operations relating to the election setup, ballot creation, ballot tabulation, results consolidation, and report generation. The ES&S proposed voting system audit log provides sufficient information to allow the auditing of all operations related to ballot tabulation, results consolidation, and report generation." They also state, "The audit log events can be accessed on the DS200 onscreen or through a printed report." This tends to prove the Local Boards of Elections do have the audit logs Plaintiffs have requested.

Next, ES&S states, "in addition to the audit log described previously that records all use operation and substantial application operations or errors, the DS200 has various configuration reports, ballot accounting reports, and results reports, all of which can be used forensically for

auditing." ES&S then states, "on power up, a configuration report **is automatically printed** to create a hard copy record of the relevant configuration and settings of the particular DS200." The fact that the configuration reports are automatically printed is confirmed by the Dorchester County Board of Elections Chief Judges' Manual. The relevant portion of the manual is attached as **Exhibit 3.**

The configuration reports are **automatically printed** (emphasis added) and were requested through PIA requests but not produced. To state there are no responsive documents to this request is clearly false as the voting machines automatically print them. The configuration reports are reports that the Local Boards of Elections and the MDSBE must have in their possession and should have been produced in response to PIA requests. The configuration reports are important, because they include information on how the voting machines are configured including, but not limited to, whether they have a modem attached and whether they will automatically accept blank ballots. A sample configuration report is attached to the Affidavit of Chris Gleason as **Exhibit H**. A temporary restraining order and preliminary injunction requiring the MDSBE and Local Boards of Elections to turn over the configuration reports of the machines is necessary, as it is a public record, and it would tend to confirm or deny claims posed here.

### *Blank Ballots, Undervotes, and Overvotes*

HAVA Section 301 requires voting systems to "provide the voter with the opportunity (in a private and independent manner) to change the ballot or correct any error before the ballot is cast and counted (including the opportunity to correct the error through the issuance of a replacement ballot if the voter was otherwise unable to change the ballot or correct any error.)" *52 USC §21081(a)(1)(A)(ii)*. Maryland creates a Cast Vote Records report for each county in Maryland for each election, which contains the total number of registered voters, the total number of ballots cast,

and the results in that county. The Cast Vote Records EL45a report also shows the total number of blank ballots cast in each county in the state of Maryland for each election. Upon calculation, the total number of blank ballots cast in the 2022 General Election in Maryland was 82,356.

Some counties had much higher percentages of blank ballot than others. Possible reasons for this can be explained below. It is likely that many people did not intend to cast blank ballots in the 2022 General Election, and the settings of the machines were the reason for the ballots being cast blank. Upon further inquiry, it has been discovered that the ES&S DS200 tabulator can be configured to accept blank ballots, undervotes, and overvotes instead of rejecting them and notifying the voter to cure the mistake. The portion of a DS200 users guide that confirms this is attached to the Affidavit of Chris Gleason as **Exhibit E**. If the voting machine is configured to automatically accept blank ballots, undervotes, and overvotes, voters are not provided the opportunity to change the ballot or correct the error before the ballot is cast and counted. This violates *52 USC §21081(a)(1)(A)(ii)*, because voters are not notified of their deficient ballot and given a chance to cure the error before the machine accepts it.

This can be confirmed in two different ways. The first way is set out in COMAR 33.10.01.03(B) which states, "The tabulators shall provide a vote cast record of all ballots cast and audit log of alerts provided to voters and tabulator events and errors." COMAR 33.10.01.03(B) confirms the audit logs will track tabulator events and errors. An example of an error would be a voter attempting to cast a blank ballot and the machine notifying them of this, which the audit log would track.

The more direct way, which is noted in the section titled ***Maryland Public Information Act***, is to review the configuration reports, which the machines automatically print. The configuration report can confirm whether the machines were configured to automatically accept

blank ballots, undervotes, and overvotes. A temporary restraining order and preliminary injunction requiring the MDBSE and the Local Boards of Elections to produce this configuration report would confirm or deny a number of Plaintiffs' claims. At the very least the MDSBE and Local Boards of Elections should be required to configure the voting machines to query or notify the voter if they are attempting to cast a blank ballot.

## **LAW**

Courts typically consider four factors when deciding whether to grant or deny a motion for preliminary injunction or temporary restraining order (TRO).

(1) Whether the potential harm to the moving party is irreparable;

(2) The nature of the harm the opponent would face were the injunction granted;

(3) How others would be affected by the grant or denial of the injunction, including the impact on the public interest; and

(4) Whether, in view of its position and evidence, the moving party is likely to succeed on the merits of the claim when the case comes to a full trial.
*Ramirez v. Collier*, 142 S.Ct. 1264, 1275 (2022); *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).

Here, the Plaintiffs' harm is to a basic right, and one that is surely incompensable by money damages. Defendants would simply have to bring the Maryland voting system back into compliance with Maryland and federal laws and would face no real harm were the injunction granted. This injunction would not only further public interest in free elections, it would restore trust in Maryland elections. Based on the evidence presented herein, the Plaintiffs have amassed substantial evidence of apparent election law violations and are likely to succeed on the merits of the claims when the case comes to a full trial.

## **CONCLUSION**

The claims presented by Plaintiffs herein are meritorious and have been brought to light by considerable research and data. Plaintiffs are fearful the 2024 elections will be administered while so many apparent violations of the law have yet to be resolved. For the reasons stated herein, Plaintiffs request their Motion for Temporary Restraining Order and Preliminary Injunction be granted.

Respectfully submitted,

HARTMAN, Attorneys at Law

Date: March 29, 2024          By:      /s/ *C. Edward Hartman, III*
                                        C. Edward Hartman, III, Bar No. 07716
                                        116 Defense Highway, Suite 300
                                        Annapolis, Maryland 21401
                                        Telephone:      (410) 266-3232
                                        Facsimile:      (410) 266-5561
                                        Email:          Ed@Hartman.law
                                        *Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 29th day of March, 2024, I served a copy of the foregoing

Plaintiff's Memorandum of Law in Support of Plaintiffs' Motion for Temporary Restraining Order

and Preliminary Injunction by electronic filing to:

> Daniel Kobrin
> Assistant Attorney General
> Office of the Attorney General
> 200 Saint Paul Place, 20th Floor
> Baltimore, Maryland 21202
> dkobrin@oag.state.md.us

/s/ *C. Edward Hartman, III*
C. Edward Hartman, III, Bar No. 07716
