# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| MARYLAND ELECTION INTEGRITY, LLC, *et al.*, <br><br>        *Plaintiffs*, <br><br> v. <br><br> MARYLAND STATE BOARD OF ELECTIONS, <br><br>        *Defendant*. | Civ. No. 1:24-cv-00672-SAG |

## BRIEF OF *AMICUS CURIAE* THE BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

TABLE OF AUTHORITIES................................................................................................. ii

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 2

I.     Plaintiffs' Claims About Supposed Registration Violations and Voting Errors Are Not Grounded in Fact.................................................................................................... 2

     A. Plaintiffs' Allegations Are Based on a Deeply Flawed Analysis of Voter Files.............. 4

     B.  Plaintiffs' Canvass is Both an Unreliable Method of Data Collection and a Potential Violation of Federal and State Voter Intimidation Law .................................................. 6

II.    The Court Should Act Quickly and Decisively to Dismiss this Frivolous Complaint....... 10

     A.  Plaintiff United Sovereign Americans Has Publicly Announced An Ambitious Plan to Flood the Courts With Lawsuits ............................................................................ 10

     B. This Lawsuit Should Be Understood as Part of a Broader Movement to Wreak Havoc on Elections and Sow Doubt About the 2024 Election................................................. 13

# TABLE OF AUTHORITIES

**CASES**                                                                                                              Page

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...................................................................................................2

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).............................................................................................2, 3, 4

*Bowyer v. Ducey*,
    506 F. Supp. 3d 699 (D. Ariz. 2020) ..................................................................13

*Colo. Mont. Wyo. State Area Conf. of NAACP v. U.S.*,
    653 F. Supp. 3d 861 (D. Colo. 2023)...................................................................10

*Donald J. Trump for President, Inc. v. Secretary of Pennsylvania*,
    830 F. App'x 377 (3rd Cir. 2020).........................................................................12

*Epcon Homestead, LLC v. Town of Chapel Hill*,
    62 F.4th 882 (4th Cir. 2023) .................................................................................3

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010)..............................................................................................11

*Nat'l Coal. On Black Civic Participation v. Wohl*,
    498 F. Supp. 3d 457 (S.D.N.Y. 2020) .................................................................10

*Pierce v. N.C. State Board of Elections*,
    --- F.4th ---, 2024 WL 1321267 (4th Cir. Mar. 28, 2024) ..................................12

*Schneider v. Donaldson Funeral Home, P.A.*,
    No. CV JFM-16-2843, 2017 WL 68644 (D. Md. Jan. 6, 2017)..........................12

*U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*,
    745 F.3d 131 (4th Cir. 2014) ........................................................................... 2-3, 4

*USA Farm Lab., Inc. v. Su*,
    --- F. Supp. 3d ----, No. 1:23-CV-00096-MR-WCM,
    2023 WL 6283333 (W.D.N.C. Sept. 26, 2023)...................................................12

## STATUTES

42 U.S.C. § 1985(3) ....................................................................................................10

52 U.S.C. § 10307(b) ..................................................................................................10

Md. Code Ann., Elec. Law § 16-201(5)-(7) ...............................................................10

## RULES

Fed. R. 201 ....................................................................................................................4

## OTHER AUTHORITIES

Brandy Zadrozny, *Disinformation poses an unprecedented threat in 2024 — and the U.S. is less ready than ever*, NBC News (Jan. 18, 2024), https://tinyurl.com/66v95wd7 ....................................................................14

Brenda Wintrode, *A group plans to challenge election boards nationwide. Maryland's is the First.*, The Baltimore Banner (Mar. 7, 2024), https://tinyurl.com/4bbsd6cp ......................................................................11

Brennan Center for Justice & First Draft, Information Gaps and Misinformation in the 2022 Elections (Aug. 2022), https://tinyurl.com/5aueuz69 ......................................................................14

Brief of *Amici Curiae* Election Officials in Support of Neither Party, *Murthy v. Missouri*, No. 23-411 (U.S. 2023), https://tinyurl.com/bdns6a3y26 ..............................................................14

Complaint, *Judicial Watch v. Ill. State Bd. of Elections*, No. 1:24-cv-01867 (N.D. Ill. Mar. 5, 2024) .....................................................13

Complaint, *Repub. Nat'l Comm. v. Aguilar*, No. 2:24-cv-00518 (D. Nev., Mar. 18, 2024) ................................................13

Complaint, *Repub. Nat'l Comm. v. Benson*, No. 1:24-cv-00262 (W.D. Mich., Mar. 13, 2024) ...........................................13

County of Santa Clara, Registrar of Voters, "I Have Changed My Name", https://tinyurl.com/3m5j7z4a (last visited Apr. 4, 2024) ...................................6

Gabriel R. Sanchez & Keesha Middlemass, Brookings Institution, *Misinformation is eroding the public's confidence in democracy* (July 26, 2022), https://tinyurl.com/bdcvbv3c ......................................................................14

James E. Bartlett, II, et al., *Organizational Research: Determining Appropriate Sample Size in Survey Research*, 19 Info. Tech., Learning, & Performance J. 43 (2001), https://tinyurl.com/4ua2dszs ............................................................................7

Leadership Conference on Civil and Human Rights, *National and State Organizations and Local Elected Officials Support Federal Funding for Election Administration* (Sept. 28, 2023), https://tinyurl.com/52e7vupy ............................................................................15

Lynn Walsh, *Access to Information Can Help Combat the Threat to Democracy*, Hum. Rts. Mag., Vol. 48, no. 4 (July 26, 2023), https://tinyurl.com/3mhhwzr5............................................................................14

New York Citizens Audit, *Who We Are*, https://auditny.com/about/ (last visited Apr. 4, 2024) ............................................................9

Pinellas County Supervisor of Elections, *Update Your Current Voter Registration*, https://tinyurl.com/ra5w6dh7 (last visited Apr. 4, 2024) ....................................................6

Rosalind S. Helderman & Elise Viebeck, *The last wall: How dozens of judges across the political spectrum rejected Trump's efforts to overturn the election*, Wash. Post (Dec. 12, 2020), https://tinyurl.com/2rz3uc9x ............................................................................13

Ruby Edlin & Lawrence Norden, Brennan Center for Justice, *Poll of Election Officials Shows High Turnover Amid Safety Threats and Political Interference* (Apr. 25, 2023), https://tinyurl.com/4bcudpyc ....................................................................14, 15

Seo-young Silvia Kim and Bernard L. Fraga, *When Do Voter Files Accurately Measure Turnout? How Transitory Voter File Snapshots Impact Research and Representation* (Am. Pol. Sci. Ass'n, Sept. 13, 2022), https://tinyurl.com/4depca7f ............................................................................5

Ted Enamorado & Kosuke Imai, *Validating Self-Reported Turnout by Linking Public Opinion Surveys with Administrative Records*, 83 Pub. Op. Q. 723 (2019), https://imai.fas.harvard.edu/research/files/turnout.pdf ......................................................8

Toluse Olorunnipa & Michelle Ye Hee Lee, *Trump's lie that the election was stolen has cost $519 million (and counting) as taxpayers fund enhanced security, legal fees, property repairs and more*, Wash. Post (Feb. 6, 2021), https://tinyurl.com/urfmhpb5 ............................................................................14

United Sovereign Americans, *Media*, https://unite4freedom.com/media/ (last visited Apr. 4, 2024)........................................9, 11

## INTRODUCTION

*Amicus curiae* the Brennan Center for Justice at New York University School of Law[1] (the "Brennan Center") hereby submits this Brief in Support of Defendant's Motion to Dismiss.

If allowed to proceed, this case could undermine free and fair elections in Maryland in several significant ways: (1) spreading false information about Maryland's election system and the laws that govern elections, (2) disrupting upcoming elections, and (3) providing a pretext for future baseless efforts to challenge or undermine election results. Each of these threats, in turn, risks damaging public confidence in national election results.

Plaintiffs' Amended Complaint ("Operative Complaint") alleges six sweeping objections to Maryland's administration of elections. Defendant's Motion to Dismiss the Operative Complaint highlights the many problems with these allegations, including Plaintiffs' complete lack of standing and cognizable federal claim. ECF 24-1 at 7-17. *Amicus* submits this Brief for two reasons. First, the Brennan Center writes separately to explain why Plaintiffs' allegations that Maryland has tens of thousands of voter registration violations, voting system errors, and inaccuracies cannot survive dismissal for failure to state a claim. These allegations are based entirely on unsound statistical analyses that rely on methodological errors and dangerous data collection methods that risk intimidating voters in violation of federal and state law. Although the notice pleading standard does not require Plaintiffs to include all facts required to support their claims in their Operative Complaint, Plaintiffs cannot state a plausible claim for relief by

---

[1] This brief does not purport to convey the position, if any, of New York University School of Law. Although the Brennan Center for Justice benefits from a relationship with the faculty and students of New York University School of Law, it is not itself a law school, but rather a nonprofit and non-partisan public policy institute, as set forth in the accompanying Motion for Leave to File Brief as *Amicus Curiae*.

presenting unsupported factual assertions that would require the Court to make unreasonable inferences and reach unwarranted conclusions.

Second, *Amicus* writes to contextualize Plaintiffs' Operative Complaint within the broader electoral environment and to urge the Court to keep Plaintiffs from using the court system as a vehicle to disrupt Maryland's elections, spread conspiracy theories, and sow doubt about the integrity of the 2024 election. Plaintiffs' own public statements reveal that they intend for this case to be the first in a national litigation strategy that aims to upend elections in dozens of states and potentially force litigation to the U.S. Supreme Court in advance of the 2024 election. The danger of making such reckless claims extends well beyond the courtroom. False claims of widespread fraud and vulnerabilities in our election system erode public confidence in the electoral process and contribute to a heightened climate of violence against election officials and workers. Worse still, bringing emergency litigation in an election year forces election officials, who are already stretched and strained, to divert limited resources to defending against frivolous lawsuits and away from administering elections. By swiftly and decisively dismissing Plaintiffs' Operative Complaint, this Court can make clear that the judiciary cannot be used as a tool for spreading misinformation that, by design or effect, risks undermining the integrity of American elections.

## ARGUMENT

### I. Plaintiffs' Claims About Supposed Registration Violations and Voting Errors Are Not Grounded in Fact.

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Courts draw all reasonable inferences in plaintiffs' favor, but exclude from consideration "unwarranted inferences, unreasonable conclusions, or arguments." *U.S. ex rel. Oberg v. Pa.*

*Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *see also Epcon Homestead, LLC v. Town of Chapel Hill*, 62 F.4th 882, 885 (4th Cir. 2023). Allegations that provide only "naked assertions devoid of further factual enhancement" similarly do not suffice. *Iqbal*, 556 U.S. at 678. Plaintiffs do not come close to meeting this minimum threshold.

Plaintiffs' claim that Maryland's voting system is out of compliance with the National Voter Registration Act ("NVRA") and Help America Vote Act ("HAVA") rests on allegations that the system contains tens of thousands of registration violations and voting system errors. *See, e.g.*, ECF 16 at ¶¶ 53-74. In their Operative Complaint, Plaintiffs assert that they have identified these alleged problems through "[m]eticulous analysis" of records obtained from the Maryland State Voter Registration Database. *Id.* at ¶ 30. But neither the Operative Complaint nor the report[2] from which the allegations in the Operative Complaint were derived contain any explanation or context that would permit the Court to accept as true Plaintiffs' contention that there are 79,392 "current apparent registration violations" in Maryland's voter registration database or that there were 62,075 "apparent voting system errors" in the 2020 general election and 27,623 "apparent voting system errors" in the 2022 general election. *See* ECF 16 at ¶¶ 30, 69-70. In other words, the allegations in the Operative Complaint constitute precisely the type of "naked assertion[s]" that fail to provide fair notice to Defendant. *Twombly*, 550 U.S. at 555-57.

---

[2] The Operative Complaint itself attaches two exhibits that purport to provide more information about the basis for Plaintiffs' allegations. As Defendant recognized, those exhibits appear to be identical to spreadsheets included in a report that Defendant received a week before Plaintiffs filed suit. *See* David Morsberger & Katherine Straunch Sullivan, *Restoring Faith in Maryland's Elections* (Feb. 27, 2024), attached to Def.'s Mot. to Dismiss as Ex. B (ECF 8-3) and to Pl.'s TRO Motion (ECF 20-20) (hereinafter "Report"); *compare* Amend. Compl. Ex. A (ECF 1-1) & Ex. B (ECF 1-2), *with* Report at D-1 & E-1. The Court may consider the report as part of its evaluation of Defendant's Rule 12(b)(6) motion to dismiss. *See Epcon Homestead*, 62 F.4th at 885 (courts may consider documents incorporated by reference in the complaint provided they are integral to the complaint and authentic).

Perhaps recognizing this fatal flaw, Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction ("TRO Motion") attaches several affidavits and thousands of pages of explanatory exhibits that purport to explain the report's methodology and bolster its conclusions. But the additional information provided in support of the TRO Motion only underscores that the so-called "meticulous analysis" underlying Plaintiffs' allegations is based on a variety of methodological errors, and the conclusions that Plaintiffs draw from that analysis are thus unsound and unreliable. Even if considered by the Court for purposes of evaluating the motion to dismiss,[3] Plaintiffs have failed to "nudge[] their claims across the line from conceivable to plausible," *Twombly*, 550 U.S. at 557.

### A.    Plaintiffs' Allegations Are Based on a Deeply Flawed Analysis of Voter Files.

To explain the methodology used to support Plaintiffs' claims regarding supposed errors in Maryland's registration records, Plaintiffs submitted an affidavit from David Morsberger, who co-authored and "produce[d] the query and overall data contained in the [report]." ECF 9-14 at ¶ 6. The Morsberger affidavit, in turn, explains that he and an unidentified "team of other qualified programmers and volunteers" analyzed voter records from across 12 different time periods over several years: August 2021; December 2021; July 2022; December 2022; January 2023; February 2023; March 2023; April 2023; May 2023; June 2023; and July 2023. ECF 20-19 at ¶ 7; *see* Report at 1. Although voter records *can* be a reliable source of research and analysis, Morsberger's analysis of those records to find 79,392 "current apparent voter registration violations" contains

---

3 Given that the documents submitted along with the TRO Motion, ECF 20, are integral to the Operative Complaint and matters of public record subject to judicial notice, they can properly be considered without converting Defendant's motion to dismiss into a motion for summary judgment. *See U.S. ex. rel. Oberg*, 745 F.3d at 1361; Fed. R. 201 (court may take judicial notice of a fact not subject to reasonable dispute that is "generally known within the trial court's territorial jurisdiction").

fundamental flaws. Although this Brief does not exhaustively address each methodological error, the Court need not look further than Morsberger's first category of alleged violations—duplicate registrations—to understand the basic errors underlying his results.

Morsberger's analysis contains an elementary flaw: he combined the multiple voter files from several years into a single database, which he then used to conduct his "search queries." ECF 20-19 at ¶¶ 9-11. But voter files "are constantly updated and maintained," changing almost daily to account for events such as new registrations, deaths, and updates to voters' information. Seo-young Silvia Kim and Bernard L. Fraga, *When Do Voter Files Accurately Measure Turnout? How Transitory Voter File Snapshots Impact Research and Representation* 2 (Am. Pol. Sci. Ass'n, Sept. 13, 2022), https://tinyurl.com/4depca7f; *see id.* at 3 ("Voter files are, by nature, dynamic, as we have illustrated above. Voters can be added, deleted, or have their information changed in the database, all of which are affected both by election schedules and internal maintenance."). A small change in a voter's record, moreover, routinely triggers a new voter identification number, a practice that is common not only in Maryland but in most state voter rolls. In other words, when the state database detects certain changes or updates to a voter's information, it adds a new row to the voter file and assigns a new voter identification number. During regular maintenance, the row with the outdated information (including the old voter identification number) is then removed from the active file. As a result, combining multiple voter files from 2021 to 2023 into one database— as Morsberger did—will necessarily include duplicates; it simply fails to reflect that the 2023 voter files no longer contain the old voter identification numbers from 2021.

Again, the Court need not look further than Plaintiffs' first explanatory "spreadsheet" to see this problem in action. ECF 20-23. When voters change their last name (often after marriage),

states generally give them a new voter identification number.[4]  States follow a similar practice if voters register with a middle initial, but the state later obtains their full middle name.  Because Morsberger's single database of multiple voter files failed to account for (1) that practice and (2) the fact that the state later removes the old voter identification numbers from the rolls, there is no basis for the inference that his list of duplicates constitute illegal registrations; he found duplicates simply by spotting a voter with an old identification number on an earlier voter file, as well as the voter with their new identification number on an updated file.  *See, e.g.*, ECF 20-23 at line 7 (reflecting a last name change from "Scott" to "Steyer-Scott"); *id.* at line 16 (reflecting two unique voter identification numbers for "Brittany A Duncan" and "Brittany Anne Duncan").  Indeed, a cursory look at just a few of Morsberger's explanatory spreadsheets reveals hundreds of allegedly "duplicate" registrations with a different last name that may fall victim to this oversight.  *See* ECF 20-24, 20-25, 20-26, 20-27.  Because Morsberger's analysis failed to account for how voter files are maintained, it offers no plausible inference that duplicate registrations exist on the active voter file, nor can this Court draw any supported conclusions from his findings.[5]

### B. Plaintiffs' Canvass is Both an Unreliable Method of Data Collection and a Potential Violation of Federal and State Voter Intimidation Law.

---

[4] *See, e.g.*, County of Santa Clara, Registrar of Voters, *I Have Changed My Name*, https://tinyurl.com/3m5j7z4a (last visited Apr. 4, 2024) ("If you are already registered to vote and you have legally changed your name by court action or marriage, you should complete a new Voter Registration Card under your new name."); *see also* Pinellas County Supervisor of Elections, *Update Your Current Voter Registration*, https://tinyurl.com/ra5w6dh7 (last visited Apr. 4, 2024) ("Complete a new Voter Registration Application online or mail an application with your change of name . . . .").

[5] Morsberger's affidavit provides *no* explanation for how the "apparent voting system errors" in the Operative Complaint were calculated, but a review of the report's "voting violation" chart suggests that these allegations may flow from the alleged voter registration violations. *See* Report at E-1, E-2 (using the same categories as the report's voter registration charts).  As such, they suffer from the same fundamental methodological flaws described above.

Separate from the analysis of Maryland voter files, Plaintiffs' remaining support for their allegations appear to stem from the report, which claims to have unearthed many "inaccurate records" and 5,625 instances of "apparent fraudulent votes" throughout the state.  Report at 1; ECF 20-19 at ¶ 27; ECF 16 at ¶ 75 (alleging that "[i]naccuracy and the specter of fraud have irretrievably damaged the reliability and credibility" of Maryland's voting system results). These conclusions are based on information gathered by a team of "citizen volunteers," who conducted both a statewide canvass and a canvass in Baltimore County by knocking on voters' doors to verify the accuracy of Maryland's voter records.  ECF 20-19 at ¶¶ 27, 34; Report at 2.  These findings, like those discussed above, hinge on fundamentally flawed methodology.

First, the report states that it derived its statewide canvass sample from a universe of 112,506 Maryland voters.  Report at 2.  Morsberger's affidavit adds that the pool included individuals who voted in the 2020 general election but did not vote in the previous election cycles. ECF 20-19 at ¶ 31.  But the rest of the affidavit and the report provide no information to assess the reliability of this pool. How, for example, is this narrow pool of voters who did not vote in prior election cycles representative of the over 4 million voters in the Maryland State Voter Registration Database?

The analysis becomes even more problematic when one looks to the 383 voters selected for statewide canvassing from the pool of 112,506 voters.  According to the report, Morsberger and his team selected these voters to reach a "95% confidence level with a +/-5 margin for error." Report at 1.  And to be sure, a *response rate* of 383 voters would have resulted in a statistically acceptable sample size.[6]  But by the report's own account, 383 voters did not respond to the

---

[6]  *See, e.g.*, James E. Bartlett, II, et al., *Organizational Research: Determining Appropriate Sample Size in Survey Research*, 19 Info. Tech., Learning, & Performance J. 43 (2001), https://tinyurl.com/4ua2dszs (describing the procedures for determining appropriate sample size).

statewide survey; instead, volunteers "successfully contacted" 180 voters, 20 of those voters refused to answer questions, and 160 responded. Report at 2. Put differently, the report applied its margin of error to a sample size of 383 voters, when in reality the sample contained only 160 voters. This sample size in no way meets the acceptable confidence level and margin of error that the report ascribes to its results.

An elementary review of the Baltimore County canvass reveals similar flaws. For one, Baltimore County has 31 precincts, but the report "randomly selected" just 3 of those precincts— with no mention as to which precincts they selected or how they selected them—to understand voter behavior across the county. Report at 3. And unlike the statewide canvass numbers, the report omits altogether how many voters actually *answered* the survey questions. Instead, it states only that volunteers "successfully contacted" 418 of the 904 voters identified for the canvass. *Id*.

Again, perhaps in recognition of these flaws, Morsberger's affidavit includes as an exhibit a "Master List of Inaccuracies" that purports to list voters' responses to the statewide canvass in spreadsheet form. ECF 20-83; ECF 20-84. This list, however, reveals only one fundamental truth: knocking on unsuspecting voters' doors to ask questions about their voting history—invasive questions that may confuse or alarm voters—does not produce reliable, representative results.[7] Indeed, the spreadsheet reflects that Morsberger's volunteers talked to one ten-year-old child as well as an individual who had experienced a stroke since 2020 and thus could not remember their voting history. ECF 20-83; ECF 20-84. And generally, many voters might have a difficult time remembering if and how they voted several years ago. In any event, if one takes as true the number

---

[7] *See, e.g.*, Ted Enamorado & Kosuke Imai, *Validating Self-Reported Turnout by Linking Public Opinion Surveys with Administrative Records*, 83 Pub. Op. Q. 723 (2019), https://imai.fas.harvard.edu/research/files/turnout.pdf (discussing various biases that lead to some groups overreporting voter turnout).

of voters who said they did not vote in the 2020 election, but their voter records reflected otherwise, Plaintiffs have extrapolated 5,625 instances of "apparent fraudulent votes" from the answers of just a handful of voters (including the 10-year-old child and stroke survivor).  *See* ECF 20-83; ECF 20-84.

As to the report's high percentage of "inaccurate records," an overwhelming amount of the listed voters had simply moved and no longer lived at their old address.  ECF 20-83.  Given the sprawling date range of the voter files Morsberger used, it is not difficult to imagine a scenario in which volunteers questioned a voter in 2023, but Morsberger and his team compared that answer to an outdated voter file that had since been changed, resulting in an apparent "inaccuracy."[8]

Separate and apart from the unreliability of door-to-door canvassing as a research method, the approach also risks subjecting voters to unlawful intimidation.  Just last year, a group affiliated with Plaintiff United Sovereign Americans received a cease-and-desist letter from the New York Office of the Attorney General for engaging in potentially unlawful intimidation and deceptive door knocking.[9]  *See* Letter from Lindsay McKenzie & Rick Sawyer, New York Office of the Attorney General to Marly Hornik, NY Citizens Audit Civic Fund, Inc. (Sept. 21, 2023), attached hereto as Exhibit A.  Although the report and Morsberger's affidavit do not provide any specifics on the volunteers' door knocking procedures here, the act of going to someone's home to ask them invasive questions about their voting history and family may place them in "fear of harassment

---

[8] An accurate analysis would have used the voter file issued after the close of voter registration prior to the November election in 2020, and appended that file to include the 2020 general election vote history when formally released (typically two to three months after the election).

[9] Marly Hornick serves as both CEO of United Sovereign Americans and the Executive Director of New York Citizens Audit, the recipient of the New York Attorney General's cease-and-desist letter.  United Sovereign Americans, *Media*, https://unite4freedom.com/media/ (last visited Apr. 4, 2024); New York Citizens Audit, *Who We Are*, https://auditny.com/about/ (last visited Apr. 4, 2024).

and interference with their right to vote" in violation of federal and state law, even if done without the specific intent to intimidate. *Nat'l Coal. On Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 480 (S.D.N.Y. 2020) (explaining the test for voter intimidation under 52 U.S.C. § 10307(b)); *Colo. Mont. Wyo. State Area Conf. of NAACP v. U.S. Election Integrity Plan*, 653 F. Supp. 3d 861, 870 (D. Colo. 2023) (denying defendant's motion for summary judgment in case alleging that the defendant organization's members went door-to-door to interrogate voters under the pretense of uncovering phantom ballots in violation of 52 U.S.C. § 10307(b) and 42 U.S.C. § 1985(3)); *see also* Md. Code Ann., Elec. Law § 16-201(5)-(7).

In support of their allegations, Plaintiffs have offered nothing more than unwarranted inferences drawn from unsound data and data collection methods—including methods that risk impermissibly intimidating voters. The absence of any plausible factual support gives this Court ample reason to dismiss Plaintiffs' claims under Rule 12(b)(6).

## II. The Court Should Act Quickly and Decisively to Dismiss this Frivolous Complaint.

For the reasons explained in Defendant's Motion to Dismiss and in Part I above, this lawsuit must be dismissed because—in addition to its many jurisdictional defects—the allegations in Plaintiffs' Complaint are entirely lacking in factual support. *Amicus curiae* urges this Court to act swiftly and decisively in disposing of this case. Such decisive action is needed to deter Plaintiffs and other groups from what appears to be another attempt to co-opt the judicial process in order to sow chaos and undermine confidence in American elections.

### A. Plaintiff United Sovereign Americans Has Publicly Announced An Ambitious Plan to Flood the Courts With Lawsuits.

As Defendant rightly notes, Plaintiff United Sovereign Americans effectively concedes in the Complaint that it lacks standing to bring this suit. *See* ECF 24-1 at 9 (citing ECF 16 at ¶ 187). Yet that group has publicly announced that filing "emergency litigation" in courts across the

country is precisely its aim. Rebecca Terrell, *One Woman's Quest to Restore Election Integrity*, The New American, Vol. 40, No. 5 (Mar. 11, 2024), attached hereto as Exhibit B. United Sovereign Americans CEO Marly Hornik recently told a reporter that the group views "TROs" as the solution to the country's problem with "inflated voter rolls." *Id.* Ms. Hornik also explained that United Sovereign Americans is working in 27 states and that they will be "ready to file suit" in 11 of those states "in late March or early April." *Id.*; *see also* Brenda Wintrode, *A group plans to challenge election boards nationwide. Maryland's is the First.*, The Baltimore Banner (Mar. 7, 2024), https://tinyurl.com/4bbsd6cp (noting that, according to a United Sovereign Americans spokesperson, this lawsuit was "the first of many suits" the group is planning nationwide); United Sovereign Americans, *Media*, https://unite4freedom.com/media/ (last visited Mar. 29, 2024) ("We are actively preparing litigation in 23 states."). United Sovereign Americans' ultimate goal is equal parts ambitious and transparent: the cases that the group plans to file "involve nine federal circuits, and should [United Sovereign Americans] receive opposing rulings in two different circuits, 'it could force the litigation to the Supreme Court in advance of the 2024 election.'" Ex. B at 4 (quoting Ms. Hornik).

The TRO Motion confirms that Plaintiffs seek to use this case as a test for the litigation strategy that United Sovereign Americans has announced. *See* ECF 20. By their nature, temporary restraining orders and preliminary injunctions constitute "drastic and extraordinary" remedies. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). But the scope of the relief that Plaintiffs ask this Court to grant—on an emergency basis and without any plausible claim to *any* relief—is, simply put, staggering in its brazenness. Among other things, Plaintiffs seek an order from this Court enjoining Defendant from administering or certifying *any* election until a variety of vague conditions are met. *See* ECF 20 at 6-7. Just weeks before Plaintiffs filed the TRO motion,

the Fourth Circuit described mandatory injunctions, which seek to "alter[] the status quo before the case even begins," as a "particularly aggressive form of preliminary injunction" that is "warranted only in the most extraordinary circumstances." *Pierce v. N.C. State Board of Elections*, --- F.4th ---, 2024 WL 1321267, at *6 (4th Cir. Mar. 28, 2024) (citations and internal quotation marks omitted). Plaintiffs' filing is devoid of almost *any* attempt to explain why they are entitled to emergency relief, much less to a mandatory injunction. *See* ECF 20-1 at 21 (including one conclusory paragraph purporting to apply the legal standard to the facts alleged).

To be sure, the Brennan Center agrees with Plaintiffs that this Court should move swiftly to resolve this case. Indeed, as Plaintiffs note, the "public interest in free elections" is of paramount importance and Maryland's Primary Election, set for May 14, 2024, is "fast approaching." ECF 20-1 at 7, 21. Put succinctly by the Third Circuit: "[f]ree, fair elections are the lifeblood of our democracy. Charges of unfairness are serious. But calling an election unfair does not make it so. Charges require specific allegations and then proof." *Donald J. Trump for President, Inc. v. Secretary of Pennsylvania*, 830 F. App'x 377, 377 (3rd Cir. 2020). In this case, the appropriate resolution requires outright dismissal of the Operative Complaint, not investment of valuable judicial time and resources in adjudicating an unwarranted emergency request by Plaintiffs—especially when those Plaintiffs have failed to provide any plausible basis for obtaining relief from this Court or even for invoking its jurisdiction. *See, e.g.*, *USA Farm Lab., Inc. v. Su*, --- F. Supp. 3d ----, No. 1:23-CV-00096-MR-WCM, 2023 WL 6283333, at *1 (W.D.N.C. Sept. 26, 2023) (noting that, "[i]n light of the jurisdictional issue raised" by defendant's motion to dismiss, the court had denied request for an expedited hearing on plaintiff's motion for preliminary injunction and held the motion in abeyance pending resolution of the motion to dismiss); *Schneider v. Donaldson Funeral Home, P.A.*, No. CV JFM-16-2843, 2017 WL 68644, at *4 (D. Md. Jan. 6,

2017), *aff'd*, 733 F. App'x 641 (4th Cir. 2018) (denying motion for TRO based on conclusion that plaintiff lacked standing to sue and had failed to state a cognizable legal claim).

### B. This Lawsuit Should Be Understood as Part of a Broader Movement to Wreak Havoc on Elections and Sow Doubt About the 2024 Election.

Unfortunately, attempts to use the court system to disrupt the democratic system and undermine confidence in elections are not a new phenomenon. Plaintiffs' self-identified strategy appears to adapt and revive litigation tactics used after the 2020 general election, which courts almost universally rejected. *See, e.g.*, Rosalind S. Helderman & Elise Viebeck, *The last wall: How dozens of judges across the political spectrum rejected Trump's efforts to overturn the election*, Wash. Post (Dec. 12, 2020), https://tinyurl.com/2rz3uc9x (finding that, "[i]n a remarkable show of near-unanimity across the nation's judiciary," at least 86 judges rejected at least one post-election lawsuit). This lawsuit demands the same result. In the prescient words of a federal district court that considered similar claims:

> Not only have Plaintiffs failed to provide the Court with factual support for their extraordinary claims, but they have wholly failed to establish that they have standing for the Court to consider them. Allegations that find favor in the public sphere of gossip and innuendo cannot be a substitute for earnest pleadings and procedure in federal court.

*Bowyer v. Ducey*, 506 F. Supp. 3d 699, 724 (D. Ariz. 2020).

A prompt and authoritative dismissal is especially important here because Plaintiffs' baseless and unsupported allegations themselves pose a threat to the integrity of American elections.[10] False information already has caused demonstrable, dangerous harm to our election

---

[10] Plaintiffs are not alone in pursuing the dangerous tactic of filing litigation aimed at calling into question the voter list maintenance practices of various state's election offices. *See, e.g.*, Complaint, *Judicial Watch v. Ill. State Bd. of Elections*, No. 1:24-cv-01867 (N.D. Ill. Mar. 5, 2024) (alleging voter registration inaccuracies in violation of the NVRA); Complaint, *Repub. Nat'l Comm. v. Benson*, No. 1:24-cv-00262 (W.D. Mich. Mar. 13, 2024) (same); Complaint, *Repub. Nat'l Comm. v. Aguilar*, No. 2:24-cv-00518 (D. Nev. Mar. 18, 2024) (same).

system.  *See, e.g.*, Brandy Zadrozny, *Disinformation poses an unprecedented threat in 2024 — and the U.S. is less ready than ever*, NBC News (Jan. 18, 2024), https://tinyurl.com/66v95wd7 (discussing the threat of local movements that spread disinformation about elections); Lynn Walsh, *Access to Information Can Help Combat the Threat to Democracy*, Hum. Rts. Mag., Vol. 48, no. 4 (July 26, 2023), https://tinyurl.com/3mhhwzr5 ("The proliferation of misinformation causes confusion and frustration and contributes to increased polarization and distrust of democratic institutions."); Gabriel R. Sanchez & Keesha Middlemass, Brookings Institution, *Misinformation is eroding the public's confidence in democracy* (July 26, 2022), https://tinyurl.com/bdcvbv3c ("One of the drivers of decreased confidence in the political system has been the explosion of misinformation deliberately aimed at disrupting the democratic process. This confuses and overwhelms voters.").  And false claims of widespread election errors not only erode public confidence in the electoral system, but also contribute to increased threats, harassment, and intimidation against election officials.  *See* Ruby Edlin & Lawrence Norden, Brennan Center for Justice, *Poll of Election Officials Shows High Turnover Amid Safety Threats and Political Interference* (Apr. 25, 2023), https://tinyurl.com/4bcudpyc; Brennan Center for Justice & First Draft, Information Gaps and Misinformation in the 2022 Elections (Aug. 2022), https://tinyurl.com/5aueuz69; *see also* Brief of *Amici Curiae* Election Officials in Support of Neither Party at 8, *Murthy v. Missouri*, No. 23-411 (U.S. 2023), https://tinyurl.com/bdns6a3y.

In addition to undermining confidence in elections and endangering the public servants who administer them, frivolous claims about election integrity generate significant costs—in time, resources, and taxpayer dollars.  *See, e.g.*, Toluse Olorunnipa & Michelle Ye Hee Lee, *Trump's lie that the election was stolen has cost $519 million (and counting) as taxpayers fund enhanced security, legal fees, property repairs and more*, Wash. Post (Feb. 6, 2021),

https://tinyurl.com/urfmhpb5 (reporting that states incurred at least $2 million in costs related to legal challenges and security for election officials following the 2020 election and acknowledging that "[h]ow much taxpayers ultimately had to spend to beat back Trump's efforts to delay certification or overturn the results remains unknown, because many state officials did not specifically track their legal expenses"); Edlin & Norden, *supra* (reporting on research from 2022 showing that the cost of responding to new threats against election workers, along with "protecting against insider threats as a result of growing belief in conspiracy theories around elections," could exceed $600 million over a 5-year period). Understaffed and overworked election officials bear the burden of those costs most acutely in an election year, which means responding to frivolous lawsuits requires them to divert already strained resources away from administering free and fair elections. *See, e.g.*, Leadership Conference on Civil and Human Rights, *National and State Organizations and Local Elected Officials Support Federal Funding for Election Administration*, (Sept. 28, 2023), https://tinyurl.com/52e7vupy (providing letter to Congress that highlights "urgent gaps in equipment, personnel, and facilities" and explains that "[w]hen election administration is not adequately resourced, the core functions of our elections and the democratic process are threatened").

For all of these reasons, this Court should quickly and forcefully reject Plaintiffs' attempt to entangle the judicial system in what appears to be an aggressive campaign to disrupt and undermine confidence in the 2024 elections not only in Maryland, but across the country.

Dated: April 25, 2024                    Respectfully Submitted,

/s/ *Leah J. Tulin*

Leah J. Tulin (Federal Bar No. 20083)
BRENNAN CENTER FOR JUSTICE
AT NYU SCHOOL OF LAW
1140 Connecticut Avenue NW, Suite 1150
Washington, DC 20036
Phone: (202) 650-6397; Fax: (212) 463-7308
tulinl@brennan.law.nyu.edu

Lauren E. Miller*
Jasleen K. Singh*
BRENNAN CENTER FOR JUSTICE
AT NYU SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271
millerl@brennan.law.nyu.edu
jasleen.singh@nyu.edu

*Attorneys for Amicus Curiae Brennan Center for Justice at NYU School of Law*

*Motion for *pro hac vice* admission forthcoming

## **CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that she has electronically submitted a true and correct copy of the above and foregoing via the Court's electronic filing system on the 25th day of April 2024.

*/s/ Leah J. Tulin*
Leah J. Tulin